**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**March 27, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

MELVIN BOWMAN,

      Petitioner-Appellant,

v.

DONICE NEAL, Warden, and the
ATTORNEY GENERAL OF THE
STATE OF COLORADO,

      Respondents-Appellees.

No. 05-1117

(D.C. No. 99-cv-503-MSK-CBS)
(D. Colorado)

**ORDER AND JUDGMENT**[*]

Before **KELLY, BRISCOE,** and **McCONNELL**, Circuit Judges.

Petitioner Melvin Bowman, a Colorado state prisoner sentenced to life imprisonment for two counts of first degree murder and one count of first degree arson, appeals the district court's denial of his 28 U.S.C. § 2254 habeas petition. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

I.

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

*Factual background*

The relevant underlying facts of this case were outlined by the Colorado Supreme

Court in addressing Bowman's direct appeal following his initial trial and convictions:

This prosecution arose from a fire on February 18, 1979, at the
Cottonwood Motel in Aurora in the apartment where Bowman lived with
his wife, Evelyn, and his three stepsons, Kevin, Anthony and Vincent.  Mrs.
Bowman and 12-year-old Vincent died in the blaze.  * * *

The prosecution presented the following evidence.  At approximately
7:00 p.m. on February 18, 1979, Debra and Thomas Perry, who lived in the
unit adjoining that of the Bowmans, heard an explosion from the Bowmans'
apartment.  The Perrys went to their window seconds later and observed the
defendant leaving the apartment parking lot in his car.  Both of these
witnesses accurately described the defendant's car and identified Bowman
in the courtroom.

The manager of the motel, Jack Kennedy, testified that, upon being
advised of the fire by Bowman's stepson Anthony, Kennedy opened the
door of the apartment, found the unit to be full of smoke, and called the fire
department.  While awaiting the arrival of the firefighters, Kennedy again
opened the apartment door and observed flames in the corner away from the
door on a bed and nearby chair.  Kennedy stated that, just before the
firemen arrived, the defendant drove up to the motel parking lot and told
Kennedy that he had tried to enter the apartment earlier but the door was
hot.  Kennedy noticed that Bowman's pant legs were burned.  Kennedy also
noticed another motel resident, John Hanlon, talking with the defendant in
the parking lot.  Hanlon later testified that he spoke with a middle-aged
black man, [Bowman is black] whom he could not identify positively,
outside of the apartment during the fire.  Hanlon stated that the man told
him that no one was inside the burning apartment.

Fireman William Jones testified that he spoke with Bowman outside of
the apartment after the fire was extinguished.  During this conversation,
Jones noticed that the defendant's pant legs were burned in front.  Bowman
indicated that he wanted to enter the apartment because he was cold.  Jones
denied permission, but obtained a blanket for the defendant, who wrapped it
around himself.  Lieutenant Fix later obtained the burned pants from the
defendant . . . .

Firemen found the two victims fully clothed in the bathtub of the apartment with the shower running. Paramedics administered aid on the scene and then transported the victims to the hospital where they were pronounced dead. Several firemen, policemen, paramedics and doctors noticed the smell of gasoline on the victims' clothing. A coroner testified that each victim died of cardio-respiratory arrest from smoke and fire inhalation, and exhibited carbon monoxide toxicity.

Fire investigators testified that they gathered several samples of materials from the apartment to determine the cause of the fire. Pieces of carpeting and material from the furniture and from the victims' clothing were tested for, and found to contain, a volatile hydrocarbon with the chemical properties of gasoline. Expert testimony established that gasoline had been poured on the furniture and the floor, and that someone was sitting in the chair near the bed when the fire started. One expert expressed the opinion that the flammable fumes were ignited by the pilot light of a space heater that was only a few feet away from where the gas was poured. This expert opined that ignition occurred within the range of two seconds to two minutes after the gasoline was spread.

The defendant's burned pants were also analyzed. An expert testified that the singed areas on the pants were consistent with their presence in the apartment at the moment of ignition because the pants displayed "flash marks" characteristically made only at the point of ignition of a volatile hydrocarbon. The fire would have ignited low to the floor, and the positioning of the singe marks on the lower part of the pant legs was an important basis for this expert's conclusion.

Other evidence recovered from the scene of the crime included a plastic antifreeze container cut into two pieces and smelling like gasoline, and two paper matches burned at the tips. The bottom half of the container was found near the front door of the apartment and the matches were near it. The top half of the container was found outside under a mattress that had been removed from the apartment by the firefighters.

Police found a paring knife from the apartment kitchen in the defendant's coat pocket. The knife had white specks on it, analyzed by experts as having the chemical properties of plastic. Traces of blood, too small for analysis, were present on the antifreeze container. Band-Aid wrappers, a box of Band-Aids and a receipt from Safeway for ninety-six cents plus tax, dated the day of the fire, were found in the defendant's car.

A doctor testified that he treated the defendant for a cut finger, requiring stitches, at the hospital after the fire was over.

The foregoing evidence was supplemented by the testimony of Bowman's stepsons. Kevin Toliver, who was eighteen years old at the time of trial, testified that the family had moved to Denver from Chicago a few months before the fire because his mother wanted a "change of life." He stated that on the afternoon of the incident he picked up his little brother Vincent in his car, and the two boys then met their mother at a restaurant-lounge. They purchased four fish dinners to go, and returned to the apartment, where they found the defendant. The defendant was angry that they had purchased only four dinners, and he began to argue with Kevin. Mrs. Bowman then asked Kevin to leave, and he drove to a friend's apartment. Kevin returned home later that evening to find that the firemen and police officers were present. Kevin also testified that he had seen a white plastic antifreeze container in the trunk of Bowman's car on the day before the fire.

* * *

Anthony Toliver, fourteen years old at the time of trial, testified that on the afternoon of February 18, 1979, he was shooting pool with a friend, who drove him back to the Cottonwood Motel at about 7:00 p.m. When he arrived, he saw the defendant in his car driving slowly, first in one direction and then the other, on Colfax Avenue in front of the motel. Anthony saw that the apartment was on fire, and he notified the manager, who called the fire department. Anthony then stopped his stepfather and told him that the apartment was on fire. The defendant replied that he knew and that he had attempted to enter the apartment but the fire burned his pant legs. Anthony also related that the defendant had told him that he had gone to the store to get some beer before the fire started. The day before the fire, Anthony had cleaned Bowman's car. During the course of the project he had seen a Safeway plastic antifreeze container in the trunk of the vehicle, but no Band-Aids or Band-Aid containers were present in the car at that time.

On cross-examination, defense counsel established that the police had taken swabs of Anthony's hands for evidence while he was at the hospital after the fire. Defense counsel asked Anthony if he had given a statement to the police and if he was on probation when he gave the statement. The district attorney's objection to the latter question was sustained. Out of the hearing of the jury, defense counsel stated that he would establish that

Anthony was on probation for a juvenile offense at the time of the fire and that charges of aggravated robbery were also pending against him. The reasons for introducing these matters were to establish that Anthony lied when he testified that he was living with his stepfather during part of February, while he was actually in a juvenile detention facility, and to show that Anthony was resentful toward his parents for placing restrictions on him due to his trouble with the law. These supposed restrictions on Anthony's personal activities supplied "possible motives for having been involved in this incident, himself," according to defense counsel. Defense counsel's theory, although not well developed in his argument to the court, was that Anthony had a motive to start the fire himself and that he also was motivated to testify against the defendant because of resentment and of a desire to divert suspicion from himself.

People v. Bowman, 669 P.2d 1369, 1372-74 (Colo. 1983) (Bowman I).

*Procedural background*

Bowman was charged by information in the District Court of Arapahoe County, Colorado, with three counts of first degree murder with respect to each of the victims, as well as one count of first degree arson. The case proceeded to trial in July 1979. Bowman was found guilty of all charges and sentenced to six concurrent life sentences for the murder convictions and a concurrent 25 to 35 year term of imprisonment for the arson conviction. The Colorado Supreme Court reversed Bowman's convictions on direct appeal, concluding that restrictions placed on Bowman's cross-examination of his stepson, Anthony Toliver, violated Bowman's right of confrontation under the federal and Colorado constitutions. Bowman I, 669 P.2d at 1376.

Bowman was retried in June 1984. Bowman was again found guilty of first-degree murder with respect to both victims, as well as first-degree arson. Bowman was sentenced to concurrent terms of life imprisonment on the murder convictions, and a

-5-

concurrent 16 year term of imprisonment for the arson conviction. The Colorado Court of Appeals affirmed Bowman's convictions on direct appeal. See People v. Bowman, 738 P.2d 387 (Colo. Ct. App. 1987) (Bowman II). The Colorado Supreme Court subsequently denied Bowman's petition for review.

On April 16, 1990, Bowman filed a pro se motion for post-conviction relief pursuant to Colo. R. Crim. P. 35(c). The trial court appointed counsel to represent Bowman in the Rule 35(c) proceedings and held a hearing on the motion. Ultimately, the trial court denied Bowman's motion. The Colorado Court of Appeals affirmed the denial of post-conviction relief. On September 6, 1994, the Colorado Supreme Court denied certiorari.[1]

On July 29, 1996, Bowman filed a petition for writ of habeas corpus in the District Court of Fremont County, Colorado (the county where he was incarcerated). That court construed Bowman's petition as a second Rule 35(c) motion and transferred it to the District Court of Arapahoe County, Colorado, where Bowman was tried and convicted. The District Court of Arapahoe County concluded that Bowman had either raised, or could have raised, all of the issues he sought to pursue in his motion, and thus was not entitled to state habeas relief. The Colorado Court of Appeals affirmed in part and dismissed in part. In doing so, the Colorado Court of Appeals noted that most "of the

---

[1] While the appeal of the denial of Bowman's Rule 35(c) motion was pending, Bowman filed a federal habeas petition in the United States District Court for the District of Colorado. The federal district court dismissed that petition without prejudice for failure to exhaust state court remedies, and we affirmed the district court's decision.

contentions raised" by Bowman "were either raised, raised and withdrawn, or could have been included in either [Bowman]'s direct appeal or his first Crim. P. 35(c) motion," and thus were subject to dismissal. ROA, Vol. I, Doc. 127, Exh. G at 3. The Colorado Supreme Court subsequently denied certiorari on September 21, 1998.

On March 12, 1999, Bowman initiated these federal habeas proceedings by filing a pro se petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The district court dismissed two of the thirteen claims asserted in Bowman's petition for failure to state a cognizable federal claim because they were based upon the alleged ineffectiveness of Bowman's state post-conviction counsel. The district court also appointed counsel to represent Bowman, and counsel filed a supplemental brief in support of Bowman's petition. On March 1, 2004, the magistrate judge issued a report and recommendation recommending that Bowman's petition be denied. Although Bowman filed written objections to the magistrate judge's report and recommendation, the district court overruled those objections and dismissed Bowman's petition on February 17, 2005. On March 7, 2005, Bowman filed a notice of appeal and a request for a certificate of appealability, which was granted by the district court.

II.

Because Bowman filed his federal habeas petition well after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), AEDPA's provisions apply to this appeal. See McLuckie v. Abbott, 337 F.3d 1193, 1197 (10th Cir. 2003). "Under AEDPA, the appropriate standard of review depends on whether a claim

was decided on the merits in state court." Id. "If the claim was not heard on the merits by the state courts, and the federal district court made its own determination in the first instance, we review the district court's conclusions of law de novo and its findings of fact, if any, for clear error." Id. (internal quotations omitted). If, however, the claim was adjudicated on the merits by the state courts, the petitioner will be entitled to federal habeas relief only if he can establish that the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id., § 2254(d)(2). "When reviewing a state court's application of federal law, we are precluded from issuing the writ simply because we conclude in our independent judgment that the state court applied the law erroneously or incorrectly." McLuckie, 337 F.3d at 1197. "Rather, we must be convinced that the application was also objectively unreasonable." Id.

## III.

*Admission of Kevin Toliver's transcribed testimony from the first trial*

The evidence presented by the prosecution at Bowman's second trial was substantially similar to that presented at the first trial, with one important exception. Kevin Toliver, one of Bowman's stepsons and a prosecution witness during the first trial, died prior to the second trial. Over defense counsel's objection, the trial court allowed

the prosecution to introduce Kevin's testimony from the first trial.[2]   The following is a

summary of that testimony:

> Kevin Toliver, who was eighteen years old at the time of trial, testified that the family had moved to Denver from Chicago a few months before the fire because his mother wanted a "change of life."  He stated that on the afternoon of the incident he picked up his little brother Vincent in his car, and the two boys then met their mother at a restaurant-lounge.  They purchased four fish dinners to go, and returned to the apartment, where they found the defendant.  The defendant was angry that they had purchased only four dinners, and he began to argue with Kevin.  Mrs. Bowman then asked Kevin to leave, and he drove to a friend's apartment.  Kevin returned home later that evening to find that the firemen and police officers were present.  Kevin also testified that he had seen a white plastic antifreeze container in the trunk of Bowman's car on the day before the fire.

> On cross-examination, defense counsel attempted to establish that Kevin had lied about seeing the antifreeze container the day before the fire and also had lied about the reasons for the family's move to Denver.  When defense counsel inquired: "To your knowledge, was anyone else in the family having problems in Chicago?" the trial court sustained the district attorney's objection.  Out of the hearing of the jury [at the first trial], defense counsel made an offer of proof that Kevin's younger brother Anthony was in "some trouble" in Chicago, and argued that Kevin properly could be cross-examined about it to impeach his account of the reasons for

---

[2] In determining the admissibility of Kevin's transcribed testimony, the trial court first found (and it was uncontroverted) that Kevin was deceased and therefore, under the Colorado Rule of Evidence 801(a)(4), unavailable as a witness.  The trial court proceeded to conclude that Bowman's counsel at the first trial had a full and fair opportunity to cross-examine Kevin, even though counsel may have failed to question Kevin regarding the pendency of criminal charges against him (that separate issue is discussed below).  Accordingly, the trial court concluded that Kevin's transcribed testimony was admissible under Colorado Rule of Evidence 801(b)(1), which provides:

> Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

the family's move. Defense counsel also argued that evidence about Anthony's trouble in Chicago would be relevant to his "possible motives." The [trial] court [at the first trial] held that this was an inappropriate attempt to impeach Kevin on collateral issues and disallowed the line of questioning.

Bowman I, 669 P.2d at 1373-74.

Bowman contends that the introduction, during his second trial, of this transcribed testimony from the first trial violated his right of confrontation because, during the first trial, his defense counsel was wrongly prohibited from questioning Kevin "about . . . his brother[] [Anthony's] legal troubles, or about the family's reasons for leaving Chicago" and relocating in Denver. Aplt. Br. at 25. According to Bowman, defense counsel's goal in seeking to question Kevin regarding legal problems that his brother Anthony had been having was to bolster "the defense theory that Anthony . . . was an alternative suspect, and to demonstrate both Anthony's possible motive for starting the fire and Kevin's bias in favor of protecting his younger brother." Id. at 18.

Bowman first raised this issue on direct appeal following his second trial. The Colorado Court of Appeals disposed of the issue in the following manner:

On appeal, defendant first argues that the trial court erred in admitting the transcript of Kevin's prior trial testimony because of the restriction on cross-examination imposed by the prior trial court judge. We disagree.

At defendant's first trial, Kevin testified that he and his family moved to Denver from Chicago because his mother wanted a "change of life." On cross-examination, defendant attempted to impeach that testimony by questioning Kevin as to the difficulties that his younger brother, Anthony, had with the law in Chicago but was not permitted to pursue that line of questioning. Anthony was subsequently called as a witness but defendant was not permitted to cross-examine him regarding his involvement with the

law. In reversing defendant's conviction, our supreme court determined that defendant's cross-examination of Anthony had been impermissibly restricted, but expressed no opinion regarding Kevin's cross-examination. (citation omitted).

Under CRE 804(b)(1), prior trial testimony is admissible only when the party against whom it is offered had the opportunity to cross-examine the witness fully at the prior proceeding. The scope and limits of cross-examination lie within the sound discretion of the trial court. (citations omitted). Absent a showing of abuse of discretion or manifest prejudice, limitation of cross-examination does not constitute reversible error. (citation omitted).

Kevin's statement regarding the reasons for his family's move to Denver may have been vague or incomplete, but we do not view it as necessarily inconsistent with the testimony defendant attempted to elicit on cross-examination. Thus, Kevin's credibility would have been affected minimally, if at all, by the admission of that testimony. Moreover, to the extent the attempted cross-examination would have served to illustrate Anthony's legal difficulties, no prejudice resulted to the defendant. Anthony testified at the second trial and his involvement with the law was established on direct and cross-examination. Under these circumstances, we cannot say that the admission of Kevin's prior testimony constituted reversible error.

Bowman II, 738 P.2d at 389.

Bowman contends that even though the Colorado Court of Appeals discussed the admissibility of Kevin's transcribed testimony, it failed to reach the merits of his federal constitutional claim, i.e., that admission of that transcribed testimony violated his Sixth Amendment right of confrontation. Thus, Bowman argues, we are not required to give deference to the Colorado Court of Appeals' ruling under 28 U.S.C. § 2254(d), and instead are free to review the constitutional claim de novo.

We disagree. At the outset of its discussion of the issue, the Colorado Court of

Appeals specifically noted that Bowman was challenging the admission of Kevin's transcribed testimony "because of the restriction on cross-examination imposed by the prior trial court judge." Bowman II, 738 P.2d at 839. Although the Colorado Court of Appeals did not thereafter cite to any federal cases in resolving the issue, this does not mean that the court failed to address the merits of Bowman's constitutional claim. As the Supreme Court noted in Early v. Packer, 537 U.S. 3 (2002), a state court is not required to cite to, nor even be aware of, controlling Supreme Court cases, "so long as neither [its] reasoning nor the result of [its] decision contradicts" controlling Supreme Court precedent. Id. at 8; e.g., Gipson v. Jordan, 376 F.3d 1193, 1196 n.1 (10th Cir. 2004) (treating state court decision as an "adjudication on the merits," even though its reasoning was not expressly stated). It is also worth noting that when Bowman filed a petition for writ of certiorari with the Colorado Supreme Court challenging the Colorado Court of Appeals' decision, he made no mention of the Court of Appeals having overlooked his Sixth Amendment claim. To the contrary, he expressly stated that he "d[id] not quarrel with the cases cited by the Court of Appeals" in resolving the issue. ROA, Vol. I, Doc. 127, Exh. D at 5-6. Thus, we are bound to apply the deferential standards of review set forth in 28 U.S.C. § 2254(d).[3]

---

[3] Respondents vigorously argued below, and continue to assert on appeal, that Bowman did not fairly present his Sixth Amendment claim to the Colorado appellate courts on direct appeal, and instead challenged the admission of Kevin's transcribed testimony exclusively on state law grounds. Although respondents' argument is a close one, we conclude, for the reasons outlined above, that the constitutional claim was raised on direct appeal and the Colorado courts rejected it on the merits.

Turning to the merits of Bowman's arguments, "[t]he Sixth Amendment's Confrontation Clause, made applicable to the States through the Fourteenth Amendment, provides: 'In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'" Ohio v. Roberts, 448 U.S. 56, 62-63 (1980) (internal citations omitted). That right, however, "does not bar admission of an unavailable witness's statement against a criminal defendant if the statement bears adequate indicia of reliability." Crawford v. Washington, 541 U.S. 36, 40 (2004) (internal quotation marks omitted) (citing Roberts, 448 U.S. at 66). "To meet that test, evidence must either fall within a 'firmly rooted hearsay exception' or bear 'particularized guarantees of trustworthiness.'" Id. (quoting Roberts, 448 U.S. at 66). Notably, the Supreme Court "has deemed generally immune from subsequent confrontation attack" "previously cross-examined prior-trial testimony . . . ." Roberts, 448 U.S. at 72-73.[4] Therefore, the narrow question presented by Bowman is whether the

---

[4] Bowman contends that his claim is controlled by the Supreme Court's decision in Davis v. Alaska, 415 U.S. 308 (1974), in which the Supreme Court noted that cross-examination "is the principal means by which the believability of a witness and the truth of his testimony are tested." Id. at 316. Although Davis has some relevance to Bowman's claim, we conclude that the controlling precedent is Roberts, which dealt with the application of the Confrontation Clause in a case in which a hearsay declarant was not present for cross-examination at trial. Notably, Roberts was issued prior to Bowman's second trial. Although the Supreme Court later rejected, in Crawford, certain of the statements in Roberts, that is irrelevant here because Crawford was issued long after Bowman's convictions and sentence became final. See Allen v. Reed, 427 F.3d 767, 774 (10th Cir. 2005) (noting "the current state of the law is irrelevant" under AEDPA, and that, instead, "we are exclusively concerned with the state of the case law at the time [petitioner's] conviction became final."). Moreover, nothing in Crawford is inconsistent with the outcome here.

limitations placed on his defense counsel's cross-examination of Kevin at the first trial were so severe as to call into question the reliability of Kevin's testimony and thus prevent its admissibility at the second trial.

As we read the decision in Bowman II, the Colorado Court of Appeals resolved this question against Bowman on the basis of two alternative rationales. First, the Colorado Court of Appeals concluded that the statement by Kevin on direct examination "regarding the reasons for his family's move," although perhaps "vague or incomplete," was not "necessarily inconsistent with the testimony [Bowman] attempted to elicit on cross-examination," i.e., that Anthony had been having some legal problems in Chicago. 738 P.2d at 389. Because "Kevin's credibility would have been affected minimally, if at all, by the admission of that testimony," the Colorado Court of Appeals concluded that the trial court did not err in admitting Kevin's transcribed testimony from the first trial. Id. Second, and alternatively, the Colorado Court of Appeals concluded that even if the trial court erred in admitting Kevin's transcribed testimony from the first trial, the error was harmless. More specifically, the Colorado Court of Appeals stated:

> [T]o the extent the attempted cross-examination would have served to illustrate Anthony's legal difficulties, no prejudice resulted to the defendant. Anthony testified at the second trial and his involvement with the law was established on direct and cross-examination. Under these circumstances, we cannot say that the admission of Kevin's prior testimony constituted reversible error.

Bowman II, 738 P.2d at 389.

After reviewing the record on appeal, we conclude that neither of these rationales

was contrary to, or involved an unreasonable application of, clearly established federal law. More specifically, we agree with the Colorado Court of Appeals that the limitations on the cross-examination of Kevin imposed by the first trial court were not so severe as to render Kevin's testimony unreliable. Further, we agree with the Colorado Court of Appeals that, even assuming the limitations were so severe as to warrant the exclusion of Kevin's transcribed testimony at the second trial, the admission of that testimony was harmless.[5] In addition to the fact that Anthony testified at the second trial and was subject to cross-examination regarding his criminal history, the evidence presented by the prosecution against Bowman was extremely strong, if not overwhelming. Accordingly, we conclude that Bowman is not entitled to federal habeas relief on the basis of this claim.

*Defense counsel's failure during the first trial to question*
*Kevin Toliver regarding his criminal history*

Bowman also contends that the second trial court erred in admitting Kevin's transcribed testimony because, in Bowman's view, his counsel at the first trial "failed to impeach Kevin with available evidence of his [own] criminal record," Aplt. Br. at 30, which included an "arrest[] for auto theft in Chicago in early 1979 [shortly prior to the

---

[5] It is not entirely clear what harmless error standard the Colorado Court of Appeals applied in reaching its holding. Even assuming, however, that the Colorado Court of Appeals did not apply the harmless beyond a reasonable doubt standard applicable to constitutional errors, see Chapman v. California, 386 U.S. 18, 24 (1967), we conclude, applying the harmless error standard set forth in Brecht v. Abrahamson, 507 U.S. 619 (1993), that the admission of Kevin's transcribed testimony did not have a "substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. at 623.

fire and ensuing murders]." Id. at 18.

Bowman first raised this argument on direct appeal following his 1984 convictions. In doing so, Bowman argued that the failure of his first trial counsel to investigate and/or question Kevin about his own criminal activity "amount[ed] to ineffective assistance of counsel, which [in turn] deprived [Bowman] of his right to confront the witness against him." ROA, Vol. IV, Doc. 119, Exh. 8 at 20. Because of this ineffective assistance, Bowman argued, "the transcript of Kevin Toliver's testimony should not have been admitted" at the second trial. Id. The Colorado Court of Appeals rejected Bowman's arguments:

> Defendant also contends that the transcript of Kevin's testimony should not have been admitted at his second trial because cross-examination was inadequate as a result of ineffective assistance furnished by his former attorney. We disagree.

> At the first trial, Kevin was asked on cross-examination if he was having problems in Chicago. He responded, "No," and defense counsel did not pursue the matter, but instead attempted to question Kevin regarding difficulties of other family members. At the second trial, however, defense counsel introduced into evidence an F.B.I. "rap" sheet which showed that Kevin had an auto theft charge pending against him at the time of the first trial and argued that defendant's prior attorney's failure to obtain this information and cross-examine Kevin regarding prior criminal activity constituted ineffective assistance of counsel. In ruling the transcript admissible, the trial court considered and rejected this claim, finding that defendant had failed to demonstrate that he had been denied his right to effective assistance of counsel.

> In ruling on a claim of ineffective assistance of counsel, the threshold question is whether the defendant received the reasonably effective assistance of an attorney acting as his diligent and conscientious advocate. (citations omitted). Disagreement as to matters of trial strategy alone will not support a claim of ineffective assistance. (citations omitted).

-16-

The sole basis for defendant's claim of ineffective assistance is his former attorney's failure to cross-examine Kevin regarding prior criminal activity. On the basis of the record now before us, we cannot say that the trial court erred. The record shows that defense counsel vigorously cross-examined Kevin regarding his account of the events on the day of the fire. We see nothing to suggest that either his pre-trial investigation or his cross-examination of Kevin fell below the standard demanded of attorneys in criminal cases. (citation omitted).

Bowman II, 738 P.2d at 389-90.

Bowman's claim, though ultimately directed at the admission of Kevin's testimony at the second trial, hinges on his assertion that he was denied the effective assistance of counsel during his first trial.[6] As such, the claim is governed by the familiar two-part test outlined in Strickland v. Washington, 466 U.S. 668, 687 (1984). Under that test, a defendant must establish that (1) his counsel's performance fell below an objective standard of reasonableness and (2) there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different. Id. at 688.

In rejecting Bowman's claim on direct appeal, the Colorado Court of Appeals did not expressly cite to Strickland. It did, however, cite to a controlling Colorado case, People v. Norman, 703 P.2d 1261 (Colo. 1985), in which the Colorado Supreme Court acknowledged and applied the Strickland standards. Further, it is clear from the Colorado

---

[6] At oral argument before this court, Bowman's counsel attempted to reframe the issue, stating that Bowman was not asserting a claim of ineffective assistance of counsel, and instead was simply asserting a violation of his right of confrontation. Clearly, however, Bowman is limited in this federal habeas proceeding by the arguments he asserted in state court. Thus, like the Colorado Court of Appeals, we shall treat Bowman's claim as one of ineffective assistance of counsel.

Court of Appeals' analysis that the standards it was applying were consistent with Strickland. Thus, Bowman is precluded from obtaining federal habeas relief on this claim unless he can establish that the Colorado Court of Appeals' resolution of the claim was contrary to, or an unreasonable application of, Strickland.

We conclude that Bowman cannot satisfy this demanding standard. In resolving Bowman's claim, the Colorado Court of Appeals concluded that Bowman's counsel at the first trial "vigorously cross-examined Kevin regarding his account of the events on the date of the fire." 738 P.2d at 390. A review of the transcript of Kevin's testimony amply supports this conclusion. Not only did Bowman's counsel question Kevin about why the family moved to Denver and how they ended up at the Cottonwood Motel, he questioned Kevin extensively regarding the events that occurred on the day of the murder, including the argument that occurred between Kevin and Bowman approximately thirty minutes before the fire occurred. Bowman's counsel also vigorously cross-examined Kevin regarding his testimony on direct that he had looked in the trunk of Bowman's car on the day prior to the murders and observed a white, plastic anti-freeze container. Thus, the Colorado Court of Appeals' conclusion that defense counsel's performance did not "f[a]ll below the standard demanded of attorneys in criminal cases," id., was neither contrary to, nor did it involve an unreasonable application of, Strickland.

*Restriction of cross-examination of John Dicke*

During Bowman's second trial, the prosecution sought permission to present the testimony of John Dicke. Dicke, an attorney licensed in the State of Colorado, worked as

a public defender in February 1979 and, in that capacity, represented Anthony Toliver in the Denver Juvenile Court in connection with a charge of aggravated robbery. On February 7, 1979, Dicke was present for a detention hearing for Anthony Toliver and, prior to the hearing, observed Bowman and his wife "bickering back and forth." State Trial Tr. at 219. Dicke asked Bowman "what was going on with his family," and Bowman responded: "I'm tired of this bullshit, I'm not going to take it anymore." Id. at 220. During the detention hearing, Dicke noticed that there continued to be "a great deal of hostility between" Bowman and his wife, and "could see the anger between them." Id. at 221. Dicke's impression, based upon what he observed, was that Bowman "didn't want Anthony home," id. at 232, and that Bowman's "anger extended to more or further than just being extremely angry with Anthony." Id. at 233. Bowman's counsel objected to the admission of Dicke's testimony, arguing that the incident Dicke observed occurred eleven days prior to the fire and thus was too remote to be relevant. Id. at 214. Bowman's counsel also argued that the incident was not relevant for purposes of proving Bowman's motive to murder his wife and Vincent because Dicke heard no threats directed by Bowman towards either Anthony or his mother. Id. The trial court overruled defense counsel's objections and permitted Dicke to testify. Id. During recross-examination, Bowman's counsel asked Dicke: "And you [Dicke] came forward with this information in 1984?" Id. at 236. The prosecutor objected, arguing that the question was beyond the scope of redirect. Id. The trial court sustained the objection. Id.

Bowman now contends that the trial court's restriction of his cross-examination of

Dicke violated his right to confront witnesses as guaranteed by the Sixth Amendment. Before we can reach the merits of this issue, however, we must first determine whether the claim is procedurally barred. Respondent argued below, and the district court agreed, that the claim was procedurally barred because (a) when Bowman first raised the claim in his initial Rule 35(c) proceeding, he failed to exhaust his state court remedies with respect to the claim, and (b) although Bowman attempted to raise the claim again in his second Rule 35(c) proceeding, the Colorado courts considered the claim procedurally defaulted. Bowman disputes this conclusion.

"[A]n adequate and independent finding of procedural default will bar federal habeas review of [a] federal claim, unless the habeas petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice." Harris v. Reed, 489 U.S. 255, 262 (1989) (internal quotation marks and citation omitted). This rule applies if the "last state court rendering a judgment in the case rests its judgment on the procedural default." Id.

Here, Bowman did not raise the John Dicke recross-examination issue on direct appeal. Rather, he raised it for the first time in the Rule 35(c) motion he filed on April 16, 1990, seeking post-conviction relief. In a brief in support of that motion, Bowman argued, in pertinent part, that he was denied his constitutional right to due process and a fair trial when the trial court limited his counsel's recross-examination of Dicke regarding why he waited until 1984 to come forward with information regarding the case. After the

-20-

trial court denied his Rule 35(c) motion, Bowman, represented by counsel, appealed to the Colorado Court of Appeals. In his appellate brief, Bowman did not challenge the trial court's ruling on the John Dicke claim. Instead, Bowman argued that (1) he received ineffective assistance of counsel during the hearing on his Rule 35(c) motion (resulting in the denial of his right to a full and fair hearing), (2) without a full transcript of both trials it was impossible for the trial court to determine whether evidence of Kevin Toliver's testimony from the first trial was properly read into evidence during the second trial, (3) without a full transcript of his second trial it was impossible for the trial court to determine whether Kevin Toliver was, in fact, unavailable to testify[7], and (4) without a full transcript of his second trial it was impossible for the trial court to determine whether Bowman's trial and appellate counsel were ineffective. Indeed, Bowman's opening appellate brief made no specific mention of the John Dicke claim. For example, in recounting the procedural history of his case, his brief stated that the Rule 35(c) motion "alleged that his conviction was Unconstitutional for a variety of reasons including ineffective assistance of counsel at trial and on appeal." ROA, Vol. IV, Doc. 119, Exh. 10 at 3. Similarly, in the argument section of his brief, Bowman made a fleeting reference to "violation[s] of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution." Id. at 6. However, there was no explanation of, or arguments regarding, the John Dicke issue.

---

[7] Bowman's appellate brief never mentioned Kevin Toliver by name; rather, the brief simply referred to "an unavailable witness . . . ."

Similarly, in the petition for writ of certiorari he filed with the Colorado Supreme Court, Bowman made no mention of the John Dicke issue. Instead, he asserted that

> [t]he issues presented for review are whether the Court of Appeals erred in holding that he was not denied effective assistance of counsel during his Crim. P. 35(c) proceeding, that the defendant was denied access to certain transcripts necessary to substantiate his claims, and that he was denied an opportunity to attack certain evidence read into the record by a presumably unavailable witness.

ROA, Vol. I, Doc. 127, Exh. F at 2.

In light of these facts, we conclude that Bowman did not fairly present the John Dicke claim to the Colorado appellate courts at the time he appealed the denial of his initial Rule 35(c) motion. "Fair presentation of a prisoner's claim to the state courts means that the substance of the claim must be raised there." Patton v. Mullin, 425 F.3d 788, 809 n.7 (10th Cir. 2005). "The prisoner's allegations and supporting evidence must offer the state courts a fair opportunity to apply controlling legal principles to the facts bearing upon his constitutional claim." Id. Here, for the reasons already discussed, Bowman did not offer the Colorado appellate courts a fair opportunity to decide the John Dicke issue.[8]

It is true that Bowman attempted to raise the John Dicke issue a second time when, in July 1996, he filed in state court a petition for writ of habeas corpus (which was

---

[8] In his second attempt at post-conviction relief in the Colorado state courts, Bowman admitted in a pro se brief filed with the Colorado Supreme Court that the substantive claims asserted in his initial Rule 35(c) motion were "not . . . appealed to the Colorado Court of Appeals due to ineffective assistance of counsel . . . on appeal of the trial court's denial of his 35(c) motion." Amended Reply Br. of the Aplt. at 1, Bowman v. Henderson, Case No. 96-SA-446.

construed by the state courts as a second Rule 35(c) motion). However, the state district court denied that motion on the grounds that Bowman "ha[d] either appealed or . . . ha[d] every opportunity allowed by law to appeal every issue" set forth in his petition. Bowman v. Henderson, Case No. 96-CV-2228 (Dist. Ct. Arapahoe County, Colo. Nov. 8, 1996). Further, the Colorado Court of Appeals then dismissed Bowman's attempt to appeal the denial of the John Dicke issue, concluding the issue was procedurally barred. Thus, the Colorado courts consider the John Dicke issue procedurally barred, and the claim is in turn procedurally barred for purposes of federal habeas review (Bowman does not assert cause and prejudice for the default).

AFFIRMED.

Entered for the Court

Mary Beck Briscoe
Circuit Judge