**UNITED STATES COURT OF APPEALS**
**TENTH CIRCUIT**
Office of the Clerk
Byron White United States Courthouse
Denver, Colorado 80257
(303) 844-3157

Elisabeth A. Shumaker                                    Douglas E. Cressler
  Clerk of Court                                         Chief Deputy Clerk

January 14, 2008

**TO:**   All recipients of the Opinion

**RE:**   06-7091, *Cummings v. Sirmons*

The Opinion filed October 30, 2007, has been modified.  The name "Melissa Mayo" has been changed to "Melissa Moody."  A corrected opinion is attached to this letter.

Sincerely,

Elisabeth A. Shumaker
Clerk of Court

FILED
United States Court of Appeals
Tenth Circuit

October 30, 2007

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

JESSE CUMMINGS, JR.,

      Petitioner-Appellant,

v.

MARTY SIRMONS, Warden, Oklahoma
State Penitentiary,

      Respondent-Appellee.

No. 06-7091

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA
(D.C. No. CV-99-447-S)**

Chris Eulberg, Eulberg Law Offices, Oklahoma City, Oklahoma, for Petitioner-Appellant.

Robert Whittaker, Assistant Attorney General, State of Oklahoma, (W. A. Drew
Edmondson, Attorney General, with him on the briefs), Oklahoma City, Oklahoma, for
Respondent-Appellee.

Before **BRISCOE, MURPHY,** and **O'BRIEN**, Circuit Judges.

**BRISCOE**, Circuit Judge.

      Petitioner Jesse James Cummings, an Oklahoma state prisoner convicted of first

degree murder and sentenced to death, appeals the district court's denial of his 28 U.S.C.

§ 2254 habeas petition.  We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

I.

*Factual background*

The relevant underlying facts of this case were outlined in detail by the Oklahoma

Court of Criminal Appeals (OCCA) in addressing Cummings' direct appeal:

> In September of 1991, [Cummings] lived in Phillips, Oklahoma, in a residence he shared with his first wife, Sherry Cummings, his second wife, Juanita Cummings, [Cummings'] and Sherry's daughter, Debra, Juanita's son Robbie, and [Cummings'] father, Jesse Samuel Cummings. [Cummings] had married Sherry in 1987, and, without divorcing her, had married Juanita in 1989.  He, in effect, had two wives.

> On September 8, 1991, [Cummings] went to the Atoka County Sheriff's Office and reported his sister, Judy Ann Moody Mayo, and her daughter, Melissa Moody, as missing.  [Cummings] told the clerk that friends had told him that his sister's vehicle had been seen parked at Atoka Lake on Highway 43 and that it had broken down as its hood and doors were opened. [Cummings] reported what his sister and her daughter had been wearing at the time of their disappearance.  He also said that someone had possibly picked them up.  [Cummings] showed the clerk pictures of Judy and Melissa.

> The next day, on September 8, Judy's body was found floating in a small pond adjacent to Atoka Lake.  She had suffered gunshot wounds to her head and neck and her body was wrapped in a quilt and a mattress pad.  The following month, in October, the skeletal remains of Melissa were located by the side of a bridge over the Clear Boggy River in Choctaw County. Due to the skeletonization of the body, an exact cause of death could not be determined but evidence of sharp force injuries to several ribs was noted.

> The case remained unsolved for almost three years.  During this time, [Cummings] and his two wives moved from Phillips, Oklahoma, to Lehigh, Oklahoma.  In the summer of 1994, Juanita went to work for a minister named Edward Fields.  Juanita told Fields that she had shot Judy and that [Cummings] had made her do it.  She also stated that [Cummings] had wanted her to kill Melissa but she got sick and could not do it.  She told

2

Fields that after she killed Judy she went to work and when she got back Judy's body was gone and so was Melissa.

Subsequently, Juanita was charged with First Degree Murder for the death of Judy, and Sherry was charged with First Degree Murder for the death of Melissa. First Degree Murder charges were dropped against Sherry when she entered a plea agreement with the State and pled guilty to two counts of Accessory After the Fact and one count of Permitting a Child to be Abused. First Degree Murder charges were also dropped against Juanita and she pleaded guilty to Second Degree Murder. Both Sherry and Juanita implicated [Cummings] in the commission of the crimes and testified against him at trial.

Sherry testified that on September 4, 1991, [Cummings] told her to take his sister, Judy, to look at houses and to shoot Judy from behind when they got to an empty house. The next morning, on September 5, [Cummings] left early to drive his father to the hospital in Oklahoma City. That morning, Sherry took Judy to look at houses. She did not shoot Judy while they were looking at houses. When they had finished looking at houses, Sherry and Judy returned to [Cummings'] residence. Sherry, Judy, and Juanita watched TV in the house and the kids, Debra, Robbie and Melissa were outside. When Judy indicated she was ready to leave, Sherry went to the bathroom. While she was gone she heard five gunshots. When she returned to the living room she saw Judy sitting on the couch slumped over. Juanita had shot her. Sherry and Juanita brought all three kids into the house, covering their eyes when they passed through the living room, and they put them in a back room. They then pulled Judy through the house and outside into the cellar. They cleaned blood off the couch, the floor and the living room wall. After they had cleaned, Robbie and Debra went back outside and Juanita left to go to work at the Dairy Queen in Atoka. Melissa stayed locked in the back room. Juanita returned from work around 11:00 that night.

[Cummings] returned from Oklahoma City later that same night. When he got home Sherry and Juanita met him and Juanita told him that she had killed Judy. The three of them retrieved Judy's body from the cellar and pulled her to her truck. [Cummings] went to the house and got something white that he wrapped around Judy. [Cummings] drove Judy's truck and Sherry followed in the car. Juanita stayed at the house. Sherry followed [Cummings] toward Atoka Lake. She parked her car and waited while [Cummings] drove on further. When he came back Judy was no longer in

3

the truck. [Cummings] parked Judy's truck off the side of the road next to a bridge. He raised the hood and left the truck there. [Cummings] drove home in the car with Sherry.

Sherry testified that when they arrived back at the house, [Cummings] and Juanita went into the bedroom where Melissa was hand cuffed to the bed. They were there from fifteen to twenty minutes. Juanita came out first and then [Cummings] followed. [Cummings] handed Juanita the keys to the hand cuffs and told her to bring Melissa out of the room. [Cummings] then told Sherry and Melissa to go get in the car. Sherry testified that Melissa asked where they were going and [Cummings] said they were going to meet her momma. Sherry fell asleep while they drove and she woke up when the car stopped. [Cummings] got out of the car and told Melissa to get out. They walked behind the car and climbed over a railing. They were gone fifteen to twenty minutes and when he returned to the car, [Cummings] was alone. Sherry stated that he had blood on his hands and the front of his coveralls. [Cummings] drove back to Atoka Lake and stopped on the opposite side of the lake from where he had taken Judy. He cleaned up, threw away his shoes and they drove back toward the house. On the way there [Cummings] threw his coveralls out the window. When they arrived back at the house, [Cummings] and Juanita took the couch and left. They were gone for about an hour before they returned.

Sherry testified that when she was first questioned by authorities about Judy and Melissa's disappearance she told them that they had left in a dark blue or black pickup that had come by the house. She claimed to have given this statement because [Cummings] told her to.

Juanita also testified against [Cummings] at trial. She testified that on the morning of September 5, 1991, [Cummings] told her that he wanted her to kill his sister, Judy, and he wanted her to use the .38 to do it. [Cummings] then left to take his father to Oklahoma City. Juanita testified that on the morning of September 5, she took Melissa to the welfare department with her. When they arrived back at the house, Juanita was there with Sherry, Judy and the kids. The kids were outside playing. Sherry went to the porch and called her to come out there. Sherry told her to do what she knew she needed to do and she brought Juanita the gun. Juanita went back into the house and shot Judy. Juanita and Sherry brought the kids into the house and told them to play in the bedroom. They then drug Judy's body to the cellar. They cleaned the house and couch and then Juanita went to work at the Dairy Queen.

4

Juanita testified that she arrived back home at around 11:00. When she got home she went into the bedroom where Melissa was handcuffed and lying on the bed. She went back into the living room. [Cummings] came home a little after midnight. He asked her if it was done and she replied that it was. Then Sherry and [Cummings] left the house and with the car keys and the truck keys. Juanita was told to stay in the house. She testified that she did not help move Judy's body but she never saw it again.

When [Cummings] and Sherry came back, [Cummings] told Juanita and Sherry to go in the bedroom and unhandcuff and undress Melissa. He then made them stay in the room while he raped Melissa. Afterward, [Cummings], Sherry and Melissa left the house. Only [Cummings] and Sherry returned. When he returned, [Cummings] was wearing only a pair of shorts. He had been dressed in coveralls when he left the house. He told Juanita to help him load the couch on the truck and they took it to a bridge near Centrahoma and threw it over the side of the bridge.

When questioned by authorities Juanita told them that she had been sleeping in her room when she heard someone pull up to the house and Judy hollered that she and Melissa were leaving.

Cummings v. State, 968 P.2d 821, 827-29 (Okla. Crim. App. 1998) (Cummings I) (paragraph numbers omitted).

*Procedural background*

On August 1, 1994, Cummings was charged by information in the District Court of Coal County, Oklahoma, with two criminal counts: Count 1 charged Cummings with Murder in the First Degree for the death of Judy Mayo; Count 2 charged Cummings with Murder in the First Degree for the death of Melissa Moody. On February 9, 1995, an amended information was filed charging Cummings with three criminal counts: Counts 1 and 2 were the same as in the original information; Count 3 charged Cummings with child

5

abuse of Melissa Moody.[1]  On February 14, 1995, the state filed a bill of particulars indicating that it intended to seek the death penalty against Cummings, and alleging the existence of two aggravating factors: (1) that the murder of Melissa Moody was committed for the purpose of avoiding or preventing a lawful arrest or prosecution; and (2) the existence of a probability that Cummings would commit criminal acts of violence that would constitute a continuing threat to society.

On February 9, 1996, the state filed a second amended information alleging alternative theories of first degree murder in connection with the death of Melissa Moody, i.e., the commission of the murder while engaged in the felony of kidnapping (i.e., felony murder), and premeditated murder.

The case proceeded to trial on May 6, 1996.  At the conclusion of the first-stage evidence, the trial court dismissed the child abuse charge (Count 3) without objection from the state, and the jury found Cummings guilty of the two murder charges.  During the second-stage proceedings, the state incorporated by reference all of the evidence presented during the first stage, and in addition presented evidence that, in April 1991, Cummings, with the assistance of Sherry and Juanita Cummings, raped Sherry's fourteen-year-old sister who had been babysitting his two children.  At the conclusion of all the second-stage evidence, the jury found the existence of a probability that Cummings would

---

[1] Count 3 specifically charged Cummings with "feloniously sexually abus[ing]" Melissa Moody, "a minor child 11 years of age," "while responsible for the welfare of said minor child," in violation of Okla. Stat. tit. 21, § 843 (which has since been renumbered as Okla. Stat. tit. 10, § 7115).  State Court Record, Vol. 1 at 68-69.

commit criminal acts of violence that would constitute a continuing threat to society, and that the murder of Melissa Moody was committed for the purpose of avoiding or preventing a lawful arrest or prosecution. In turn, the jury fixed Cummings' punishment at death for both counts of conviction. On May 30, 1996, Cummings was formally sentenced to death in accordance with the jury's verdict.

Cummings filed a direct appeal challenging his convictions and death sentences. On August 4, 1998, the OCCA affirmed Cummings' conviction and death sentence for the murder of Melissa Moody, but reversed Cummings' conviction and sentence for the murder of Judy Mayo. In reversing Cummings' conviction and sentence for the murder of Judy Mayo, the OCCA concluded that, as a matter of law, both Sherry and Juanita Cummings were accomplices in the murder, and that "there was no evidence presented at trial which c[ould] be found to independently connect [Cummings] with the commission of Judy's murder." Cummings I, 968 P.2d at 830. Because Oklahoma law required, in cases involving accomplice testimony, "that there . . . be at least one material fact of independent evidence that tend[ed] to connect the defendant with the commission of the crime," id., the OCCA concluded that Cummings' "conviction for Count I" had to "be reversed with instructions to dismiss." Id. The OCCA subsequently denied Cummings' request for rehearing. Cummings filed a petition for writ of certiorari with the United States Supreme Court. That petition was denied by the Supreme Court on June 7, 1999. Cummings v. Oklahoma, 526 U.S. 1162 (1999).

On April 28, 1998, while his direct appeal was still pending before the OCCA,

7

Cummings, in accordance with Oklahoma procedural rules, filed an application for post-conviction relief with the OCCA asserting eleven propositions of error. The OCCA denied the application for post-conviction relief on November 10, 1998. Cummings v. State, 970 P.2d 188 (Okla. Crim. App. 1998) (Cummings II).

On August 17, 1999, Cummings initiated this federal habeas action by filing a pro se application to proceed in forma pauperis and a motion for appointment of counsel. Cummings' motion for appointment of counsel was granted and, on February 29, 2000, Cummings filed his federal habeas petition asserting eleven grounds for relief. The magistrate judge assigned to the case conducted an evidentiary hearing on June 25, 2001. On February 21, 2003, Cummings filed a supplemental petition for writ of habeas corpus, asserting two additional grounds for relief. On August 11, 2006, the district court issued an opinion and order denying Cummings' petition. The district court granted Cummings a certificate of appealability (COA) with respect to three issues. We subsequently granted a COA with respect to one additional issue.

## II.

### *Standard of review*

Because Cummings filed his federal habeas petition well after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), AEDPA's provisions apply to this appeal. See McLuckie v. Abbott, 337 F.3d 1193, 1197 (10th Cir. 2003). "Under AEDPA, the appropriate standard of review depends on whether a claim was decided on the merits in state court." Id. "If the claim was not heard on the merits by

8

the state courts, and the federal district court made its own determination in the first instance, [this court] review[s] the district court's conclusions of law de novo and its findings of fact, if any, for clear error." Id. (internal quotations omitted). If, however, the claim was adjudicated on the merits by the state courts, the petitioner will be entitled to federal habeas relief only if he can establish that the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id., § 2254(d)(2). "When reviewing a state court's application of federal law, we are precluded from issuing the writ simply because we conclude in our independent judgment that the state court applied the law erroneously or incorrectly." McLuckie, 337 F.3d at 1197. "Rather, we must be convinced that the application was also objectively unreasonable." Id. "This standard does not require our abject deference, . . . but nonetheless prohibits us from substituting our own judgment for that of the state court." Snow v. Sirmons, 474 F.3d 693, 696 (10th Cir. 2007) (internal quotation marks omitted).

*Ineffective assistance of trial and appellate counsel*

Cummings claims he was denied effective assistance of both trial and appellate counsel. Generally speaking, "[a] claim by a habeas petitioner 'that counsel's assistance was so defective as to require reversal of a . . . death sentence has two components.'" Anderson v. Sirmons, 476 F.3d 1131, 1141 (10th Cir. 2007) (quoting Strickland v.

9

Washington, 466 U.S. 668, 687 (1984)). "'To be entitled to relief, a petitioner must prove both that his counsel's performance was deficient and that the deficient performance prejudiced his defense.'" Id. (quoting Bryan v. Mullin, 335 F.3d 1207, 1216 (10th Cir.2003) (en banc)).

*1) Claims regarding trial counsel*

Cummings contends his trial counsel was ineffective for conceding Cummings' guilt to non-charged offenses, failing to challenge what Cummings now asserts was his false confession to authorities that he assisted in disposing of Judy Mayo's body, failing to seek DNA testing of critical evidence, and failing to gather medical or psychological records on Sherry and Juanita Cummings.

*a) Failure to seek DNA testing*

We turn first to Cummings' claim that his trial counsel was ineffective for failing to seek DNA testing of critical evidence (i.e., pubic hairs found with Melissa's body and clothing identified as Melissa's that was found near Judy's body). Our review of the record on appeal indicates that this claim was never presented to the Oklahoma state courts, and instead was presented by Cummings for the first time in his federal habeas petition.

We readily conclude that this claim is procedurally barred.[2] Although the claim is

---

[2] We note, in passing, that the district court addressed this claim on the merits. Assuming, for purposes of argument, that the claim is not procedurally barred, we agree with the district court that there is no merit to the issue. In particular, it is far from clear that trial counsel's failure to request DNA testing of the evidence cited by Cummings

(continued...)

technically unexhausted, it is beyond dispute that, were Cummings to attempt to now present the claim to the Oklahoma state courts in a second application for post-conviction relief, it would be deemed procedurally barred. See Okla. Stat. Ann. tit. 22 §§ 1086, 1089(D)(2) (providing, collectively, that all grounds for relief which are actually known or which should have been known through the exercise of due diligence must be brought in an initial application for post-conviction relief). Thus, the claim is subject to what we have termed an "anticipatory procedural bar." Anderson, 476 F.3d at 1139 n.7. Further, although Cummings appears to be asserting that the attorney who represented him in his state post-conviction proceedings was ineffective for failing to raise the claim, that is insufficient to establish cause and prejudice because a criminal defendant is not constitutionally entitled to representation by counsel in state post-conviction proceedings. Fleming v. Evans, 481 F.3d 1249, 1255 (10th Cir. 2007).

Cummings also contends that he is actually innocent of the crime of conviction and, thus, should not be subject to any procedural bar that might apply to any of his

---

[2](...continued)
(i.e., pubic hairs found on the body of Melissa Moody, and clothing of Melissa's that was found near Judy Mayo's body) constituted deficient performance. And, perhaps more importantly, it is clear that Cummings was not prejudiced by trial counsel's failure in this regard. Had the DNA testing indicated a link to Cummings, such evidence would clearly have been damaging to Cummings, and trial counsel would not have wanted it to be admitted at trial. On the other hand, had the DNA testing not established any link to Cummings, that would have been, at best, only marginally beneficial to Cummings. For example, the evidence presented at trial indicated that Cummings and his two wives shared the master bedroom in their home, and that Melissa spent a significant amount of time in the bed of the master bedroom, both clothed and naked, immediately prior to being murdered. Thus, the jury could reasonably have inferred that the pubic hairs found on Melissa's body belonged to Juanita or Sherry, and such an inference would not have undermined the jury's determination that Cummings murdered Melissa.

11

ineffective assistance of trial counsel claims. We disagree. To take advantage of the "actual innocence" gateway, a habeas petitioner must "present[] evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error . . . ." Schlup v. Delo, 513 U.S. 298, 316 (1995). The petitioner must "support his allegations of constitutional error with new reliable evidence–whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence–that was not presented at trial." Id. at 324. This new evidence must be sufficient to "show that it is more likely than not that no reasonable juror would have convicted [the petitioner] in light of the new evidence." Id. at 327.

In his opening brief, Cummings argues that the Supreme Court, in its decision in House v. Bell, 126 S.Ct. 2064 (2006), indicated that it was not always necessary for a petitioner asserting actual innocence to come forward with new reliable evidence. Cummings, however, is obviously misreading the House decision. House clearly reaffirms what was made clear in Schlup: that "a gateway claim requires 'new reliable evidence–whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence–that was not presented at trial . . . .'" 126 S.Ct. at 2077 (quoting Schlup, 513 U.S. at 324). Although the House decision goes on to state that "the habeas court's analysis is not limited to such [new reliable] evidence," that statement appears intended to clarify that, in determining whether such new evidence would likely have lead the jury to acquit the petitioner, the habeas court should consider "all the

12

evidence, old and new, incriminating and exculpatory . . . ." Id. (internal quotation marks omitted).

Relatedly, Cummings contends that, "[w]ithout the illegal testimony of [his] wives, there is simply no evidence whatsoever to support a guilty verdict and he is indeed innocent." Aplt. Br. at 27. Cummings appears to misunderstand the requirements imposed by the Supreme Court in Schlup for establishing actual innocence. Nowhere in Schlup did the Supreme Court indicate that it was sufficient for a petitioner to simply attack the evidence actually presented at his trial and claim that, absent the admission of such evidence, there was not enough evidence to convict him. Rather, the Supreme Court, as outlined above, expressly held that a petitioner must come forward with new evidence, the admission of which would have made it more likely than not that he would have been acquitted. Cummings has failed to come forward with any such evidence, and thus cannot establish his claim of actual innocence.

*b) Cummings' remaining claims of ineffective assistance of trial counsel*

The remaining three claims of ineffective assistance of trial counsel were raised by Cummings for the first time in his application for state post-conviction relief. The OCCA concluded that all three of those claims were procedurally barred. More specifically, the OCCA concluded that because these claims "d[id] not turn on facts unavailable at the time of [Cummings'] direct appeal, he . . . failed to meet the pre-conditions for review of his claim on the merits and therefore review of the claim [wa]s barred." Cummings II, 970 P.2d at 190.

13

Generally speaking, we do not "address issues that have been defaulted in state court on an independent and adequate state procedural ground, unless the petitioner can demonstrate cause and prejudice or a fundamental miscarriage of justice." Anderson, 476 F.3d at 1140. We have, however, "expressed concern regarding application of Oklahoma's procedural bar to ineffective assistance of counsel claims and questioned whether it can be deemed adequate and independent to bar habeas review of claims not raised on direct appeal." Snow, 474 F.3d at 726 n.35. "Oklahoma's procedural bar rules indicate ineffective assistance of counsel claims must normally be brought on direct appeal." Id. "There is a provision, however, for remand to the trial court for an additional hearing on the ineffectiveness claims." Id. (citing Okla. Stat. tit. 22, ch. 18, App. Rule 3.11). "But Oklahoma rarely, if ever, remands cases for such a hearing." Id. We have thus held that the Oklahoma procedural bar "will apply in those limited cases meeting the following two conditions: trial and appellate counsel differ; and the ineffectiveness claim can be resolved upon the trial record alone." Id. (quoting English v. Cody, 146 F.3d 1257, 1264 (10th Cir. 1998)). "All other ineffectiveness claims," we have held, "are procedurally barred only if Oklahoma's special appellate remand rule for ineffectiveness claims is adequately and evenhandedly applied." Id. (quoting English, 146 F.3d at 1264).

Here, Cummings had a different attorney on direct appeal than at trial. At trial, Cummings was represented by Paul Faulk, who was employed by the Capital Trial Division of the Oklahoma Indigent Defense System (OIDS), and Joseph Minter, a private attorney who contracted with OIDS to act as local counsel. On appeal, Cummings was

14

represented by William Luker, who was employed by the Capital Direct Appeals Division of OIDS. Luker, acting on Cummings' behalf, raised two claims of ineffective assistance of trial counsel on direct appeal (that trial counsel was ineffective for (1) failing to investigate and use available evidence concerning Cummings' personality and character that was inconsistent with the prosecution's theory of guilt and its justification for a death sentence, and (2) failing to object to the prosecution's allegedly improper argument and references to the rape of Melissa Moody after the trial court had dismissed the child abuse charge).

Of the three remaining ineffective assistance of trial counsel claims asserted in Cummings' federal habeas petition, we conclude that only one of them could reasonably have been resolved on direct appeal based solely on the trial record. Specifically, Cummings' claim that his trial counsel was ineffective for allegedly conceding his guilt to non-charged offenses could clearly be resolved based on the trial record alone, because it is based solely on trial counsel's first-stage opening statement. The other two claims, that trial counsel failed to challenge Cummings' confession to authorities and failed to gather medical or psychological records on Sherry and Juanita Cummings, could not have been resolved on direct appeal based solely on the trial record. Both of these claims hinge, to one extent or another, on evidence outside the trial record (e.g., evidence that Cummings allegedly recanted his confession to authorities; evidence of the availability and content of medical or psychological records pertaining to Sherry and Juanita). Thus, we conclude the first claim is procedurally barred, but the latter two claims are not.

15

Reviewing the merits of these latter two claims de novo, we conclude that Cummings has failed to establish that his right to the effective assistance of trial counsel was violated. With respect to trial counsel's alleged failure to challenge Cummings' confession to police that he participated in moving Judy Mayo's body, Cummings' lead trial counsel, Paul Faulk, testified before the district court in this case that Cummings' claim of complete innocence was, in his view, "incredulous," Evid. Hrg. Tr. at 136, and that he (Faulk) therefore made a strategic decision that it was not viable to pursue such a defense theory. In light of this undisputed testimony, we conclude that Faulk made a reasonable strategic decision that cannot be the basis for a valid ineffective assistance claim. See Strickland, 466 U.S. at 690 ("strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable"). As for trial counsel's alleged failure to obtain medical and psychological records of Sherry and Juanita, Cummings fails to explain whether any such records are or were available, what information may have been contained therein, and how such information could have been successfully utilized by Cummings' counsel at trial. Thus, he has failed to establish either that his trial counsel's performance was deficient or that he was prejudiced thereby.

*2) Claims regarding appellate counsel*

Cummings contends that his "direct appeal counsel failed to raise obvious and blatant constitutional violations of his right to effective assistance of [trial] counsel," and instead "rais[ed] only two narrow claims which were rejected by the OCCA . . . ." Aplt.

16

Br. at 17. In particular, Cummings claims that his appellate counsel erred in failing to argue on direct appeal that his two trial attorneys were ineffective for:

- failing to negotiate with the prosecution;

- failing to adequately question potential jurors;

- failing to properly object or otherwise preserve error;

- failing to investigate and present evidence or effectively cross-examine witnesses;

- failing to seek suppression of Cummings' allegedly false statement;

- failing to investigate other suspects;

- failing to give Cummings competent advice on his right to testify;

- agreeing with and endorsing Sherry and Juanita's testimony;

- failing to seek suppression of testimony that Cummings may have confessed to Melissa's murder while engaged in bondage sex with Juanita;

- failing to object to inadmissible hearsay;

- failing to investigate Juanita's confession and use it for impeachment;

- failing to investigate and present evidence that Juanita was upset with Judy before killing her;

- failing to investigate and present evidence of Sherry and Juanita's propensity to resort to violence;

- failing to investigate and present impeachment evidence against witness Timothy Chancellor;

- failing to consult with experts and present evidence of the "White trash" subculture and the Battered Woman Syndrome;

- failing to use prior statements to impeach Juanita and Sherry;

17

• failing to investigate Cummings' prior statements; and

• failing to properly consult with Cummings to develop knowledge of the case.

Cummings first raised these claims in his application for state post-conviction relief. The OCCA considered and rejected the claims:

> Under [Oklahoma's] Post-Conviction Procedure Act, a claim of ineffective assistance of appellate counsel is not procedurally barred if:
>> it is a claim contained in an original timely application for post-conviction relief relating to ineffective assistance of appellate counsel and the Court of Criminal Appeals first finds that if the allegations in the application were true, the performance of appellate counsel constitutes the denial of reasonably competent assistance of appellate counsel under prevailing professional norms.
>
> 22 O.S.Supp.1995, § 1089(D)(4)(b)(2). Applying these statutory guidelines, this Court recently held:
>> [T]he threshold inquiry is (1) whether appellate counsel actually committed the act which gave rise to the ineffective assistance allegation . . . . [T]he next question is (2) whether such performance was deficient under the first prong of the two-pronged test in Strickland v. Washington. (footnote omitted). If a petitioner meets his or her heavy burden to prove deficient attorney performance, we may then consider the mishandled substantive claim. The question then becomes (3) whether such a claim meets the second prerequisite to capital post-conviction review.
>
> Walker[ v. State], 933 P.2d [327,] 333 [(Okla. Crim. App. 1997)].
>
> A review of the record reveals that appellate counsel did not raise the issue of ineffective assistance of trial counsel as fully as [Cummings] argues he should have. Accordingly, [Cummings] has made the threshold showing that counsel committed the act which gave rise to the ineffective assistance allegation. Having found such, we must now determine whether counsel's failure to raise these issues on direct appeal constitutes deficient performance. However, [Cummings] has not shown that appellate counsel's failure to do so was unreasonable under prevailing professional norms. While appellate counsel has a duty to raise relevant issues for this

18

Court's consideration, there is no obligation to raise all available non-frivolous issues. (citation omitted). The brief filed in [Cummings'] direct appeal reflects that appellate counsel raised sixteen non-frivolous claims at least equally meritorious to those which were omitted and are at issue here. We cannot find that appellate counsel's failure to investigate and litigate the ineffective assistance of trial counsel issue as fully as [Cummings] claims he should have rendered counsel's performance unreasonable under prevailing professional norms. Accordingly, because [Cummings] has not established that appellate counsel's performance was deficient, his substantive claims remain procedurally barred.

Cummings II, 970 P.2d at 191 (paragraph numbers omitted).

Although the OCCA nominally characterized the claims as being "procedurally barred" under Oklahoma law, it appears clear that the OCCA in fact considered the claims on the merits in reaching this conclusion. More specifically, the OCCA purported to conclude that appellate counsel's performance was not deficient under the second prong of its Walker test. We do not afford any deference to the OCCA's determinations, however, because we have held that the OCCA's Walker test fails to comport with the Supreme Court's holding in Strickland. Cargle v. Mullin, 317 F.3d 1196, 1205 (10th Cir. 2003). Thus, we review Cummings' claims de novo. Young v. Sirmons, 486 F.3d 655, 674 (10th Cir. 2007).

At the outset, we note that Cummings fails in his appellate brief to flesh out any of the specific claims that he alleges his appellate counsel should have raised on direct appeal. Instead, he appears to be incorporating by reference the arguments on each of those claims contained in his application for state post-conviction relief. Although that application, which is contained in the record on appeal, does address in somewhat greater

19

detail each of the claims of ineffective assistance of trial counsel, most of the arguments contained therein are likewise conclusory, and generally rely on unsubstantiated, and often outlandish, assertions of fact. In short, neither in his federal or state pleadings has Cummings sufficiently fleshed out each of the claims he contends his appellate counsel should have asserted regarding the performance of his trial counsel.

Out of an abundance of caution, however, we will proceed to address each of the claims Cummings alleges that his appellate counsel should have raised regarding the performance of trial counsel. In doing so, we will rely primarily on the arguments asserted by Cummings in his application for state post-conviction relief because the arguments made by Cummings in that pleading are set forth in somewhat greater detail than in his appellate brief.

*a) Failure to negotiate with the prosecution*

In his application for state post-conviction relief, Cummings asserted that his "[t]rial counsel failed to provide [him] with adequate and appropriate advice regarding the advisability of accepting the prosecution's plea offer to a Life Sentence on Count I and a Life Without Parole sentence on Count II." ROA, Vol. 2, Doc. 69, App. at 89. Cummings further asserted that his "[t]rial counsel failed to effectively negotiate with the prosecution for a better plea offer, because counsel failed to be adequately prepared in order to effectively marshal facts in support of a better plea offer." Id. The problem with these assertions is that Cummings fails to identify what "adequate and appropriate advice" his trial counsel allegedly should have given him, and likewise fails to identify what

20

additional preparation trial counsel should have engaged in or what facts trial counsel should have "marshaled" "in support of a better plea offer." Accordingly, he has failed to establish that his appellate counsel's performance in this regard was constitutionally deficient, or that he was prejudiced thereby.

*b) Failure to adequately question potential jurors*

Cummings alleged in his application for state post-conviction relief that his trial counsel "failed to adequately question potential jurors during jury selection in order to make necessary challenges for cause and to rationally exercise peremptory challenges . . . ." Id. at 90. "As a result," he argued, his "jury included persons who were not qualified to serve on his jury . . . and jurors who were biased against him and jurors [who] could not weigh the evidence impartially with an open minded [sic]." Id. Notably, however, Cummings did not identify what questions his trial counsel allegedly should have asked of the potential jurors, nor did he identify which jurors should allegedly have been stricken from the panel. Thus, he has failed to establish a legitimate claim of ineffective assistance of appellate counsel based on these allegations.

*c) Failure to properly object or otherwise preserve error*

Cummings asserted in his application for state post-conviction relief that his trial attorneys "were ineffective at both the guilt and sentencing stages of . . . trial in failing to object, request appropriate jury admonitions or move for mistrials, raise as error and otherwise preserve as error, issues affecting [his] fundamental rights where the circumstances presented clearly required that such action be undertaken in order to protect

and preserve [his] rights." Id. at 90. Cummings did not, however, identify any specific instances to support this general assertion. Thus, the claim fails on the merits.

*d) Failure to investigate and present evidence or effectively cross-examine*

In his application for state post-conviction relief, Cummings asserted that his trial counsel "was ineffective in failing to investigate, develop and present available and relevant evidence," and that as a result thereof, his "trial counsel was unable to competently advise [him] or make competent strategic decisions." App. at 89. Cummings also asserted that his trial counsel "fail[ed] to effectively cross-examine witnesses and impeach them with available information." Id. at 90. Notably, however, Cummings did not identify what "relevant evidence" his trial counsel failed to investigate and present (in other portions of his application, Cummings alleged that trial counsel failed to present evidence that two men who lived with Sherry's mother were child molesters, as well as evidence that Sherry and Juanita were in relationships with other men at the time of their arrests and wanted to end their marriages with Cummings; but even assuming that this is the "relevant" evidence Cummings was referring to, there was no actual evidence to support Cummings' assertions). Likewise, Cummings did not identify which witnesses trial counsel failed to properly cross-examine, and what impeaching evidence trial counsel should have used in the cross-examination of these witnesses. Thus, the claim likewise fails on the merits.

*e) Failure to seek suppression of Cummings' statement to police*

In his application for state post-conviction relief, Cummings argued that during

22

police questioning, he "repeatedly inquired about where his children were and expressed concern that they would be placed to the custody of Sherry's mother and hence known child molesters would have access to the children." Id. at 92. In turn, Cummings asserted that, "[k]nowing about [his] concerns, an OSBI agent told [him] that Sherry's mother was the only relative of the children living in Oklahoma and she would get the children, but that Sherry would get them if [Cummings] would exonerate her." Id. "Based on those inducements," Cummings asserted, he "falsely confessed to moving Judy's body . . . ." Id.

The initial problem with Cummings' arguments is that neither in his application for post-conviction relief, nor in his federal appellate briefs, does he point to any evidence to support his assertions. Presumably, he is the only witness, aside from the police officers who interrogated him, who was aware of what transpired during the interrogation. Notably, however, Cummings failed to elicit any testimony from these officers at trial remotely suggesting that Cummings was "induced" to falsely confess. In any event, given the strong evidence of Cummings' guilt, we conclude that he has failed to establish any prejudice arising out of trial counsel's purported failure to seek suppression of his statements to police.

### f) Failure to investigate other suspects

In his application for state post-conviction relief, Cummings asserted that his "[t]rial counsel failed to investigate and present evidence pointing to other suspects who assisted Anita [Juanita] and Sherry in committing this offense, including disposing [of]

the bodies of Judy and Melissa, and failed to establish the motives that those other suspects would have had in assisting the women." Id. at 102. According to Cummings, "[t]he most likely other suspects were: Sherry's mother and her boyfriend, David Potter, who lived in Atoka County between Atoka and where Melissa's body was found; and Daniel Franklin Chick, one of Sherry's lovers who was living in the Coalgate area at the time of the offense and who mysteriously moved into the Cummings' household a few weeks after these offenses." Id.

It is apparent from the record that these allegations amounted to little more than speculation on Cummings' part. In particular, Cummings has not presented any evidence, either in connection with his application for state post-conviction relief or his federal habeas petition, remotely establishing that David Potter or Daniel Chick participated in the murders or in disposing of the bodies. Thus, we conclude that Cummings has failed to satisfy either of the Strickland prongs with respect to this claim.

> g) Failure to provide Cummings with competent advice regarding his right
> to testify

Cummings asserted in his application for state post-conviction relief that his trial counsel "failed to give [him] competent advice regarding his decision to testify," and that, because he allegedly suffered from "borderline intellectual functioning," he "was overwhelmed by trial counsel's insistence on making this decision [i.e., whether to testify] for him, and hence [his] will was overborne by trial counsel's forcefulness." Id. at 92-93. Presumably, Cummings was effectively asserting that his trial counsel erroneously

24

advised him not to testify when, in fact, he should have done so.

Having carefully examined the state court records, we conclude that Cummings' trial counsel had ample reasons to advise him not to testify at trial. In particular, it prevented Cummings from being subjected to what undoubtedly would have been damaging cross-examination by the prosecution. Further, it allowed Cummings' trial counsel to focus their defense efforts on the credibility of Juanita and Sherry. Even assuming, for purposes of argument, that Cummings' trial counsel erred in advising him not to testify at trial, Cummings has failed to establish any prejudice flowing from that error. In particular, we are unable to conclude, in light of the strong evidence of Cummings' guilt presented by the prosecution, that the jury could reasonably have found Cummings' assertions of innocence believable.

*h) Agreeing with and endorsing Sherry and Juanita's testimony*

Cummings asserted in his application for state post-conviction relief that his trial counsel "was ineffective in the extreme in the manner in which Anita [Juanita] and Sherry were cross examined at trial." Id. at 93. According to Cummings, his trial counsel "asked questions in such a manner which conveyed the impression that he agreed with and endorsed the women's versions of what happened, and was only nitpicking with minor details." Id. Notably, a careful examination of the trial transcript refutes these allegations. Although Cummings' lead trial counsel often began his cross-examination questions with the phrase "Do you remember," he otherwise clearly attempted to attack the veracity of both women and in no way conveyed to the jury that he "endorsed" the

25

women's versions of what happened. Thus, Cummings has failed to establish a valid claim of ineffective assistance.

> *i) Failure to seek suppression of testimony that Cummings may have confessed to Melissa's murder while engaged in bondage sex with Juanita*

In his application for state post-conviction relief, Cummings asserted that his trial counsel should have "file[d] a motion in limine and request[ed] a preliminary hearing . . . with regard to the evidentiary sufficiency and admissibility of Anita's [Juanita's] claim that months after this offense [he], during rough bondage sex, whispered in her ear a confession about slitting Melissa's throat when he killed her." Id. at 94. Cummings alleged that Juanita "invented" this story "just days before she testified at the Preliminary Hearing" in "an attempt to curry favor with the prosecution by supplying false evidence to fill in a serious evidentiary gap in the State's case . . . ." Id. Cummings argued that both of his trial attorneys "were ineffective in failing to test the credibility, reliability and admissibility of her claims before they were heard by jurors," and "were further ineffective in failing to object to this testimony at trial." Id.

Our review of the state trial transcript leads us to conclude there is no merit to these arguments. To begin with, Cummings points to no evidence to support his assertion that Juanita "invented" her story just days before the preliminary hearing. Further, it is clear that Juanita's testimony in this regard was relevant and admissible (since it was a statement of Cummings that directly pertained to the murder of Melissa), and thus it appears highly likely that any motion in limine directed at seeking to exclude the

26

testimony would have been overruled.   Indeed, any questions as to Juanita's "credibility" and "reliability" would not have been decided by the trial court at a pre-trial hearing, but rather were ultimately for the jury to decide.  Thus, we conclude that Cummings has failed to satisfy the first Strickland prong with respect to this claim.

*j) Failure to object to inadmissible hearsay*

In his application for state post-conviction relief, Cummings argued that his trial counsel "failed to object and request a mistrial when Anita [Juanita] testified at trial about inadmissible hearsay by Melissa during [his] alleged encounter with Melissa."  Id. at 95. Specifically, Cummings complained that Juanita testified at trial "that Melissa told [him] that she had done it (i.e., oral sex) before in Arkansas," and that "[t]his unreliable and inadmissible hearsay allowed jurors to speculate that [he] was the person who had sexual contact with her in Arkansas, when he had not."  Id.

We conclude there is no merit to this claim.  Melissa's statements to Cummings were clearly inconsistent with the notion that Cummings was "the person who had sexual contact with her in Arkansas."  More specifically, if Cummings had previously had sexual contact with Melissa, then both he and Melissa would have been aware of that fact, and Melissa undoubtedly would not have made the statement to him that she allegedly did. Thus, contrary to Cummings' assertion, the jury could not have reasonably inferred that he had previously had sex with Melissa.  In any event, this issue is irrelevant to the question of whether Cummings actually murdered Melissa and Judy.

*k) Failure to investigate Juanita's confession and use it for impeachment*

27

Cummings asserted in his application for post-conviction relief that his "[t]rial counsel were ineffective in failing to present evidence at trial that the night before Anita [Juanita] went to the authorities she had confessed to [him], in a naive attempt to prompt him to end his marriage to her, that she was the one who had shot and killed Judy and done away with Melissa." Id. at 91. Cummings asserted that "[c]ounsel were further ineffective in failing to present evidence that [he] asked Anita [Juanita] to go with him to tell this to Sheriff Ward, and that was the real reason Anita [Juanita] went to the authorities: she knew that she had to turn herself in first and give her version before Mr. Cummings went to the authorities and told them what Anita [Juanita] had told him." Id. Cummings argued that he "was prejudiced by this omission because that evidence would have explained how [he] knew the basic details about Judy's death in order to falsely confess that he helped move her body, in an [sic] misguided attempt to absolve Sherry of blame." Id. "In addition," he argued, "as a result of this omission by counsel, the prosecution was allowed to argue to jurors that [he] must have been involved in Judy's murder, because he did not ask police who did it when he was first questioned by them when arrested." Id.

Notably, Cummings does not identify what "evidence" he is referring to, and nothing in the record on appeal remotely supports his assertions as to these purported events. Presumably, then, the only "evidence" of Juanita's purported "confession" to him would have been his own testimony and, as the record on appeal indicates, Cummings chose not to testify at trial. Thus, absent Cummings establishing that his trial counsel

28

were ineffective for recommending that he not testify at trial (a claim we have already rejected on the merits), he cannot establish that his counsel were ineffective for failing to present evidence of Juanita's purported confession to him.

*l) Failure to investigate and present evidence that Juanita was upset with Judy prior to killing her*

In his application for state post-conviction relief, Cummings argued that his trial attorneys "were . . . ineffective in failing to investigate and present evidence that Anita [Juanita] was upset with Judy when she killed her, because the night before Judy had dropped Melissa off at the Dairy Queen where Anita [Juanita] was working and made Anita [Juanita] take care of Melissa while Judy went drinking at Roland's Bar." Id. at 96. According to Cummings, "[p]eople present at the Cummings house when Anita [Juanita] got home from working . . . could have testified that Anita [Juanita] was in a snit over Judy doing that . . . ." Id. Cummings argued that this evidence "was relevant because Anita [Juanita] denied at trial that she had an argument with Judy before shooting," and the "omission by counsel was especially prejudicial to [him] because it established the probable motive for the fight between Anita [Juanita] and Judy which escalated into Anita [Juanita] shooting and killing Judy." Id.

Based upon our review of the state trial transcript, we conclude that Cummings has failed to satisfy either the first or second Strickland prongs with respect to this claim. There was no physical evidence (either presented at trial or subsequently pointed to by Cummings) indicating that a fight or struggle had occurred prior to the shooting of Judy, and thus we are unable to conclude that the jury reasonably could have believed that such

29

occurred. Likewise, we are unable to conclude that the jury reasonably would have believed that Juanita shot and killed Judy out of anger over Judy having left Melissa at Juanita's place of work on the prior evening. In short, we are persuaded that trial counsel acted appropriately in choosing not to pursue this purported theory of defense.

*m) Failure to investigate and present evidence of Sherry and Juanita's propensity to resort to violence*

Cummings argued in his application for state post-conviction relief that his "[t]rial counsel failed to investigate and present at trial available and admissible evidence of the propensity of Anita [Juanita] and Sherry to use violence to resolve disputes . . . ." Id. at 96. "This was relevant," Cummings argued, "because the most probable reason for Judy's death was an argument between Anita [Juanita] and Judy that escalated into a fight and Anita [Juanita] grabbing a gun." Id. As with the preceding issue, there was no evidence indicating that any type of struggle occurred prior to the shooting of Judy. We therefore reject Cummings' arguments.

*n) Failure to investigate and present impeachment evidence against witness Timothy Chancellor*

In his application for state post-conviction relief, Cummings argued that his "[t]rial counsel were ineffective in failing to investigate, discover and use at trial evidence to impeach State witness Timothy Chancellor with his prior felony convictions and his mental health history, which includes memory impairment problems . . . ." Id. at 96. Cummings argued that "Chancellor's testimony was particularly prejudicial because he claimed to have asked Mr. Cummings, years after these offenses, about the .38 [handgun]

30

that he had sold to Mr. Cummings before these offenses," and "Chancellor purported to quote Mr. Cummings as saying, in response, that the gun was a 'gone son of a bitch.'" Id. at 97. Cummings argued that, "[g]iven Mr. Chancellor's memory problems, it is incredible that he could accurately recall Mr. Cummings using those precise words." Id.

We conclude that Cummings has failed to satisfy either of the Strickland prongs with respect to this claim. To begin with, it is far from clear that evidence of Chancellor's purported mental health history would have been admissible for purposes of cross-examination (indeed, Cummings never identified precisely what this "mental health history" entailed). Further, Cummings' trial counsel actually cross-examined Chancellor about this purported statement, and Chancellor confirmed that it occurred in 1993. Thus, it appears doubtful that, had Cummings' trial counsel attempted to cross-examine Chancellor about his prior felony convictions (the nature of which Cummings never identified), it would have substantially undercut Chancellor's testimony. Moreover, a review of the trial transcript indicates that Cummings has exaggerated the significance of Chancellor's testimony. In particular, Chancellor's testimony in this regard simply confirmed what the jury already knew, i.e., that the gun disappeared following the shooting of Judy. The more important component of Chancellor's testimony was his statement that in June 1990, he gave Cummings a .38 pistol in exchange for a .22 rifle and a goat. Tr. at 477.

> o) Failure to consult with experts and present evidence of the "White Trash" subculture and the Battered Woman Syndrome

In his application for state post-conviction relief, Cummings complained that his

31

trial counsel "failed to consult with an anthropologist, evolutionary psychologist, historian or sociologist regarding the socio-economic 'White trash' subculture in which [he], his wives and the victims were raised, lived, and socialized." Id. at 98. Cummings further complained that his trial counsel "failed to consult with an expert on Battered Woman Syndrome . . . to testify to rebut Anita's [Juanita's] and Sherry's self-serving claims that they were dominated and abused by [him]." Id. "As a result," he argued, "jurors had insufficient information to correctly evaluate the evidence at trial." Id.

We conclude that Cummings has failed to establish the first Strickland prong with respect to this claim. To begin with, Cummings never identified precisely what these purported experts would have testified to, and it appears questionable whether testimony from an "expert" on "White trash subculture" would have been admissible at trial.[3] Thus, Cummings failed to present sufficient evidence and argument to establish that his trial counsel acted deficiently in failing to investigate and present such information.

*p) Failure to use prior statements to impeach Juanita and Sherry*

In his application for state post-conviction relief, Cummings argued, in conclusory fashion, that his "[t]rial counsel failed to adequately impeach Anita [Juanita] and Sherry at trial with the inconsistencies in their various versions of this offense, and failed to adequately argue those inconsistencies during closing arguments to the jury . . . ." Id. at

---

[3] The state court records do contain an affidavit from a professor at Auburn University who purportedly has studied the "white trash subculture." Nothing contained therein, however, strikes us as relevant to the issues the jury was asked to decide in Cummings' criminal trial.

32

99. Without a more precise identification of what "inconsistencies" Cummings is referring to, it is impossible to determine whether there is any merit to this argument. Thus, we conclude Cummings has failed to establish the existence of either Strickland prong with respect to this claim.

*q) Failure to investigate Cummings' prior statements*

In his application for state post-conviction relief, Cummings asserted that, "[d]ue to insufficient pre-trial preparation, trial counsel lacked an adequate knowledge of the facts of this case." Id. at 99. "By way of example," Cummings asserted, "during cross examination of a police witness during a mid-trial Jackson v. Denno hearing, trial counsel [wa]s taken by surprise to learn that Mr. Cummings had been interrogated on at least two different occasions, with only the second interrogation having been tape recorded." Id.

We again conclude that Cummings has failed to establish the existence of either Strickland prong with respect to this claim. As noted, Cummings provided only one concrete example of counsel's alleged failure to investigate, and it is unclear whether counsel's failure to learn about the multiple interrogations of Cummings was the fault of counsel, or rather a failure on the part of Cummings to provide his counsel with complete and truthful information. In any event, Cummings does not explain how counsel's "failure" to learn this information at an earlier time impacted counsel's performance at trial. Thus, he has likewise failed to establish any prejudice.

*r) Failure to properly consult with Cummings to develop knowledge of the case*

Cummings alleged in his application for state post-conviction relief that his "[t]rial

33

counsel were ineffective in failing to meaningfully and adequately consult with [him]."

Id. at 99. "As a result," he asserted, "trial counsel failed to learn important information that they should have presented at trial in order to aid jurors in understanding the evidence." Id. The sole "example" provided by Cummings of counsel's failure in this regard was the following:

> [J]urors heard a tape-recorded statement taken from [him] by OSBI agents the day after his arrest . . . . In that statement, [he] ma[de] reference to a wood stove and moving the couch. This was meaningless to jurors because they had insufficient information to decipher it. If trial counsel had taken the time to adequately interview [him], they would have learned that each Fall Anita [Juanita] and Sherry bring into the house the wood-burning stove which is their sole source of heat in the house during the winter. The stove is put in the garage every Spring and brought into the house in the Fall. It is placed in the middle room which was being used as a livingroom at the time of this offense. The couch is then moved out of the room onto the front porch, and sometimes the children's bedroom is moved into the middle room to make sure they will be warm, and their old bedroom is then converted into a livingroom. Because Mr. Cummings' father was dying of cancer and had lost a considerable amount of weight, the wood stove was brought in early that year in order to make sure he was warm. Like a typical male, Mr. Cummings did not pay much attention to when and why the women moved the furniture around and/or brought in the wood stove. His best recollection is that the wood stove had been moved into the house while he was in at the hospital with his father in Oklahoma City, and did not find it odd for the couch to be gone. In addition, Mr. Cummings and his family never purchased new furniture, but salvaged old furniture, which resulted in their being a constant change of couches in his house, as beat up couches were replaced by used couches in slightly better condition.

Id. at 99-100.

Having carefully examined the record on appeal, we conclude that these allegations fall far short of establishing that Cummings' trial counsel acted in a constitutionally deficient manner. In particular, the "example" offered by Cummings is

34

self-serving (bordering on outlandish), internally inconsistent (it suggests at one point that the wood stove "was brought in early that year in order to make sure [Cummings' father] was warm," and later indicates that Cummings' "best recollection is that the wood stove had been moved into the house while he was in at the hospital with his father in Oklahoma City," i.e., on the day of the murders), and largely irrelevant to the issues decided at trial.

*Admission of uncorroborated testimony of accomplices*

Cummings next contends that his rights under the Eighth and Fourteenth Amendments to the United States Constitution were violated because "his conviction [for the murder of Melissa] was obtained upon the uncorroborated testimony of accomplices [Sherry and Juanita], in violation of a statutorily created right." Aplt. Br. at ii. In support of this contention, Cummings points to Okla. Stat. tit. 22, § 742, which provides, in pertinent part, that "[a] conviction cannot be had upon the testimony of an accomplice unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the offense . . . ."

Cummings first raised this issue on direct appeal in challenging both of his murder convictions. Although the OCCA agreed that Sherry and Juanita were accomplices with respect to the murder of Judy, it concluded otherwise with respect to the murder of Melissa:

> [Cummings] argues in his second proposition that Sherry and Juanita Cummings were each accomplices to the murders of both Judy and Melissa, and accordingly, their testimony regarding his involvement in the commission of these offenses required corroboration. He also contends that

35

the testimony of Sherry and Juanita was not sufficiently corroborated to support his conviction for these murders.

This Court has held that, "[t]he test for determining whether a person is an accomplice is whether he or she could have been charged with the crime for which the accused is on trial." Bannister v. State, 1996 OK CR 60, 930 P.2d 1176, 1179. The record reveals that Juanita Cummings was actually charged with First Degree Murder for the killing of Judy Mayo. (footnote omitted). Although Sherry Cummings was not charged with any crime in regard to Judy Mayo's homicide, the trial court ruled that she was an accomplice to this offense as a matter of law. This ruling was supported by testimony that Sherry was present in the house at the time that Juanita shot Judy and that Sherry gave Juanita the gun that was used to kill Judy. From this, we find that both Juanita and Sherry were accomplices to Count I.

Having found that Juanita and Sherry were correctly ruled as a matter of law to be accomplices to the murder of Judy Mayo, we turn next to the question of whether their testimony implicating [Cummings] was sufficiently corroborated at trial by independent evidence of [Cummings'] involvement in the commission of the offense. "[T]he general rule is that testimony of an accomplice must be corroborated with evidence, that standing alone, tends to link the defendant to the commission of the crime charged . . . ." Sadler v. State, 1993 OK CR 2, 846 P.2d 377, 383. It is not necessary that an accomplice's testimony be corroborated in all material respects. Johns v. State, 1987 OK CR 178, 742 P.2d 1142, 1146. It is only required that there to be at least one material fact of independent evidence that tends to connect the defendant with the commission of the crime. Id. Further, circumstantial evidence can be adequate to corroborate the accomplice's testimony. Pierce v. State, 1982 OK CR 149, 651 P.2d 707, 709.

[Cummings] argues that aside from the testimony of Juanita and Sherry, there was no evidence presented at trial which can be found to independently connect him with the commission of Judy's murder. The trial record supports this assertion. Evidence was presented at trial that [Cummings] was in Oklahoma City with his father at the time that Juanita killed Judy. There was evidence that he reported his sister missing three days after she was killed. The prosecution also offered into evidence three small notebooks kept by [Cummings] in which he had written details of events which occurred after his sister's disappearance and during the investigation into her disappearance. Nowhere in these notebooks did [Cummings] write anything indicative of his involvement in Judy Mayo's

murder. The trial record also reveals that [Cummings] had made a statement to the police in which he admitted to helping drag his sister's body to her pickup and to dumping her body into the lake. While this evidence clearly implicates [Cummings] as an accessory after the fact, it does not support a finding that he acted as a principal, either by aiding or abetting his sister's murder. As [Cummings] contends, outside of the testimony of Juanita and Sherry, the evidence only supports a finding that [Cummings] assisted his wives in lying to the police and in covering up the crime. It does not independently connect him to the actual commission of Judy Mayo's murder. Accordingly, [Cummings'] conviction for Count I must be reversed with instructions to dismiss.

We next address [Cummings'] conviction for Count II, the murder of his niece, Melissa Moody. Sherry Cummings was initially charged with First Degree Murder for the death of Melissa Moody. (footnote omitted). By her own testimony, Sherry helped hold the child captive and went with [Cummings] and Melissa in the car to the place where Melissa was taken and killed. Juanita was not charged in conjunction with Melissa's homicide. The trial court did not direct the jury to consider Juanita and Sherry accomplices as a matter of law regarding the murder of Melissa. However, as the evidence was sufficient to bind Sherry over on the charge of First Degree Murder for the death of Melissa, we find that it also supports a finding that Sherry was an accomplice to this crime as a matter of law.

As to Juanita, [Cummings] asserts that she, too, was an accomplice. Under the evidence presented at trial, Juanita could not be indicted for Melissa's murder as there is no evidence that she intended to participate in the crime or aided or abetted its commission. Accordingly, we find that Juanita was not an accomplice to Melissa's murder and her testimony can be considered independent evidence connecting [Cummings] to the commission of this crime. See Bowie v. State, 1995 OK CR 4, 906 P.2d 759, 763-64. Because Juanita's testimony provided independent evidence corroborating Sherry's testimony as to at least one material fact which tended to connect [Cummings] with the commission of the crime, the jury could infer that all of Sherry's testimony was truthful. See Perry v. State, 1993 OK CR 5, 853 P.2d 198, 200. [Cummings'] assertion that his conviction on Count II was based entirely upon uncorroborated accomplice testimony is without merit.

Cummings I, 968 P.2d 829-31 (internal paragraph numbers omitted).

We conclude there is no merit to Cummings' claim. As we noted in outlining the

standard of review applicable to this appeal, if a claim was adjudicated on the merits in state court, federal habeas relief can be granted pursuant to § 2254 on that claim only if the state court decision "was contrary to, or an unreasonable application of, <u>clearly established Federal law, as determined by the Supreme Court of the United States</u> . . . ." 28 U.S.C. § 2254(d)(1) (emphasis added). Cummings, however, has identified no Supreme Court decisions establishing a constitutional requirement that the testimony of an accomplice-witness be corroborated. Moreover, we and many of our sister circuits have specifically held that there is no such constitutional requirement. <u>E.g.</u>, <u>Laboa v. Calderon</u>, 224 F.3d 972, 979 (9th Cir. 2000); <u>Foster v. Ward</u>, 182 F.3d 1177, 1193 (10th Cir. 1999); <u>Harrington v. Nix</u>, 983 F.2d 872, 874 (8th Cir. 1993); <u>Brown v. Collins</u>, 937 F.2d 175, 182 n.12 (5th Cir. 1991). Thus, Cummings is left with only his citations to Oklahoma law, which clearly cannot support his claim for federal habeas relief. 28 U.S.C. § 2254(d)(1); <u>Pulley v. Harris</u>, 465 U.S. 37, 41 (1984) ("A federal court may not issue the writ on the basis of a perceived error of state law.").

Cummings attempts, nevertheless, to convert the issue into one involving federal constitutional law by arguing that the OCCA's allegedly erroneous rejection of his argument on direct appeal resulted in (a) a violation of his equal protection rights because he was treated differently than other, similarly-situated Oklahoma criminal defendants, and (b) a violation of his due process right to a fair trial. We reject both arguments. To begin with, Cummings has cited to no United States Supreme Court decisions, and our own independent research has failed to produce any, holding that a state court's erroneous

38

application of state criminal law can result in a violation of a criminal defendant's equal protection rights. Indeed, it would be surprising if such a rule existed, because it would essentially allow state criminal defendants to convert all state law issues raised on direct appeal into constitutional claims cognizable in federal habeas proceedings. In other words, it would require federal habeas courts to review the merits of all state law determinations that were resolved against a state criminal defendant on direct appeal. As for Cummings' due process argument, the United States Supreme Court has suggested that, in rare circumstances, a determination of state law can be "so arbitrary or capricious as to constitute an independent due process . . . violation." Lewis v. Jeffers, 497 U.S. 764, 780 (1990). We are not persuaded that any such violation occurred in this case, however, particularly in light of the fact that the United States Supreme Court has never recognized an independent constitutional requirement that the testimony of an accomplice-witness must be corroborated.

*Misjoinder*

In his third issue on appeal, Cummings argues that he "was forced, over his objection, to defend himself against three appalling charges in the same trial." Aplt. Br at 55. Although he acknowledges he "was exonerated of two of the three crimes," he argues "there can be no doubt the evidence of the cruel rape and murder of which he was exonerated contributed to the jury's verdict convicting him of Melissa's murder and sentencing him to death." Id. Cummings argues that the misjoinder resulted in "violations of the Fifth, Eighth and Fourteenth Amendments." Id. at 55-56.

39

Cummings first raised the issue of misjoinder in a pretrial motion to sever Count I (charging him with the murder of Judy) from the remaining two counts involving the rape and murder of Melissa. The trial court denied that motion and ultimately tried all three counts together. On direct appeal, Cummings' challenged the trial court's denial of his motion to sever. The OCCA rejected the issue on the merits:

[Cummings] argues . . . that the trial court erred in denying his motion to sever his trial for Count I, the murder of Judy Mayo, from Counts II and III, the murder and child abuse of Melissa Moody. This Court has held that "joinder of separately punishable offenses is permitted if the separate offenses arise out of one criminal act or transaction, or are part of a series of criminal acts or transactions." Glass v. State, 1985 OK CR 65, 701 P.2d 765, 768. Further, with respect to a series of criminal acts or transactions, "joinder of offenses is proper where the counts so joined refer to the same type of offenses occurring over a relatively short period of time, in approximately the same location, and proof as to each transaction overlaps so as to evidence a common scheme or plan." Id. See also Pack v. State, 1991 OK CR 109, 819 P.2d 280, 282.

In applying this law to the facts of the present case, we find that the murders of Judy Mayo and her daughter were part of a series of criminal acts which were related to one another. Although they were not killed by exactly the same means or at the exact same time, Judy and Melissa were murdered within twelve hours of each other. Further, although Judy and Melissa were not killed in the same location, the residence that [Cummings] shared with Juanita and Sherry was central to both murders. Judy was actually killed there and Melissa was held captive there until immediately before she was taken to the location where she was killed. Finally, we find that proof as to each transaction does overlap so as to indicate a common scheme or plan. The evidence suggests [Cummings] either initially intended to kill both Judy and Melissa or that he initially intended to kill only Judy but after Judy was killed it became necessary to also kill her daughter. There was a logical relationship between the offenses.

[Cummings] also contends that the joinder of offenses was in error because it severely prejudiced him. He argues that if Count I had been tried separately from Counts II and III, the jury would not have heard testimony that he raped and killed Melissa as this would have been inadmissible

40

evidence of other crimes.  We find that these two crimes were so closely related that evidence of one murder was admissible as part of the res gestae of the other.  Accordingly, we cannot find that the joinder of offenses severely prejudiced [Cummings'] right to a fair trial.  This proposition is without merit.

Cummings I, 968 P.2d at 829 (internal paragraph numbers omitted).

To obtain federal habeas relief based on his misjoinder claim, Cummings must demonstrate that the OCCA's rejection of the claim was contrary to, or an unreasonable application of, controlling Supreme Court precedent.  The controlling Supreme Court case on this issue is United States v. Lane, 474 U.S. 438 (1986).  In Lane, the Supreme Court held that "[i]mproper joinder does not, in itself, violate the Constitution."  Id. at 446 n.8.  "Rather," the Court indicated, "misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial."  Id.  Echoing Lane, we have held that, "to obtain [federal] habeas relief" based on a claim of misjoinder, the "petitioner must show the joinder of offenses actually render[ed] petitioner's state trial fundamentally unfair and hence, violative of due process."  Lucero v. Kerby, 133 F.3d 1299, 1314 (10th Cir. 1998) (internal quotation marks omitted).

After reviewing the record on appeal, we conclude that the OCCA's rejection of Cummings' misjoinder claim was neither contrary to, nor an unreasonable application of, the principles outlined in Lane.[4]  To begin with, it is abundantly clear, as the OCCA

---

[4] There is some question whether the due process component of Cummings' argument was properly presented to the OCCA.  Specifically, in his opening brief on direct appeal, Cummings argued that the denial of his motion to sever resulted in a

(continued...)

concluded in rejecting Cummings' claim, that the murder of Melissa was so closely related to the murder of her mother Judy that evidence pertaining to the murder of Judy "was admissible as part of the res gestae of the" murder of Melissa.[5] Cummings I, 968 P.2d at 829. Indeed, it seems inconceivable that the State could have prosecuted Cummings for Melissa's murder without being permitted to provide the jury with some evidence regarding the events leading up to Melissa's death. Moreover, a review of the record on appeal firmly establishes that there was not "a great disparity in the amount of evidence underlying" the two murder charges. Lucero, 133 F.3d at 1315. As for evidence pertaining to the count charging Cummings with child abuse of Melissa, Cummings never moved to sever that count from the count charging him with murdering Melissa. Thus, any claim that the two counts involving Melissa as a victim should have been severed was never presented to or decided by the Oklahoma courts, and thus is procedurally barred (i.e., anticipatory procedural bar) for purposes of these federal habeas proceedings. In any

---

[4](...continued)
violation of his rights under the Eighth and Fourteenth Amendments to the Constitution, but nowhere made mention of the Fifth Amendment. Indeed, Cummings concedes that his "attorney did not specifically use the term 'Fifth Amendment violation', in his brief on Direct Appeal to the OCCA." Aplt. Br. at 56. But, he argues, "the gist of his argument throughout was that he was innocent, his trial was fundamentally unfair and he had been denied due process and equal protection of the law." Id. Moreover, he notes, the right of due process afforded under Oklahoma's Constitution is exactly the same as that afforded by "the Fifth Amendment to the United States Constitution." Id. In sum, he argues, "[t]he state Courts had the exact issues which serve as the basis for this claim before them and had a fair opportunity to address them." Id. at 57.

It appears unnecessary to definitively resolve this issue because, even assuming it was presented to the OCCA, there is no merit to it.

[5] We conclude, after reviewing the trial transcript, that the jury in Cummings' case could have reasonably inferred that Cummings decided to murder Melissa in order to avoid prosecution for the murder of Judy.

event, we are convinced that it was reasonable to try these two offenses together.

*Refusal of trial court to instruct jury on credibility of accomplice testimony*

In his final issue on appeal, Cummings contends the trial court violated his due process and equal protection rights when it failed to instruct the jury that Sherry Cummings and Juanita Cummings were accomplices as a matter of law. More specifically, Cummings argues that "the Oklahoma law requiring corroboration of an accomplice's testimony is a statutorily created right and, when [he] was denied the protection of that right" due to the trial court's failure to instruct the jury, "he was denied due process and equal protection under the United States Constitution." Aplt. Br. at 70.

Cummings first raised this issue on direct appeal. The OCCA rejected it on the merits, stating:

> In his third proposition [Cummings] complains that the trial court erred by refusing to instruct the jury that Sherry and Juanita were accomplices as a matter of law to Count II, the murder of Melissa Moody. As we have already determined that Juanita was not an accomplice as a matter of law to Count II, failure to instruct otherwise cannot be found to have been error. However, because the evidence was sufficient to support a First Degree Murder charge against Sherry for Melissa's murder, the trial court did err by failing to instruct the jury that Sherry was an accomplice to this crime as a matter of law. This Court has held that "where there is overwhelming evidence of guilt and the presence of sufficient corroborating testimony, the failure to so instruct is harmless." Howell v. State, 1994 OK CR 62, 882 P.2d 1086, 1092, cert. denied, 514 U.S. 1113, 115 S.Ct. 1968, 131 L.Ed.2d 858 (1995). See also Bryson v. State, 1994 OK CR 32, 876 P.2d 240, 256, cert. denied, 513 U.S. 1090, 115 S.Ct. 752, 130 L.Ed.2d 651 (1995). Because we find that there was overwhelming evidence of [Cummings'] guilt as to Count II and that [Cummings'] conviction on this count was supported by sufficient corroborating evidence, we find this error to have been harmless.

Cummings I, 968 P.2d at 831 (internal paragraph number omitted).

43

It is well established that a criminal defendant has a due process right to a fair trial. E.g., Drope v. Missouri, 420 U.S. 162, 172 (1975). Further, the Supreme Court has acknowledged that an instructional error can, under certain circumstances, result in a violation of a defendant's right to a fair trial. See Henderson v. Kibbe, 431 U.S. 145, 154 (1977); Cupp v. Naughten, 414 U.S. 141, 147 (1973). Importantly, however, the Court has stated that "[t]he burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." Henderson, 431 U.S. at 154. "The question in such a collateral proceeding," the Court has stated, "is whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process," and "not merely whether the instruction is undesirable, erroneous, or even universally condemned . . . ." Id. (internal quotation marks and citations omitted).

Here, the absence of an instruction telling the jury that Sherry was an accomplice to the murder of Melissa and thus Oklahoma law required her testimony to be corroborated by other evidence clearly did not deprive Cummings of his due process right to a fair trial. To begin with, it is undisputed, as we have previously noted, that there is no constitutional requirement that the testimony of an accomplice be corroborated by independent evidence. Moreover, the OCCA concluded, and our review of the trial transcript readily confirms, that there was substantial evidence corroborating the testimony of Sherry, including the testimony of non-accomplice Juanita. Thus, we

44

conclude that the OCCA's rejection of Cummings' claim of instructional error was not contrary to, or an unreasonable application of, the constitutional principles outlined by the Supreme Court in Henderson.

The judgment of the district court is AFFIRMED.